Carl S. Dahlstrom v. Commissioner.
Dahlstrom v. Commissioner
Docket Nos. 103-67, 6548-67.
United States Tax Court
T.C. Memo 1968-197; 1968 Tax Ct. Memo LEXIS 104; 27 T.C.M. (CCH) 959; T.C.M. (RIA) 68197; September 3, 1968. Filed Donald A. Cable, Olympic National Life Bldg., 920 Second Ave., Seattle, Wash., for the petitioner. Stephen E. Silver, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Docket No.
Year
Amount
103-67
1964
$ 172.96
6548-67
1965
1,633.46
1966
4,055.50 From the pleadings it appears that petitioner filed claims for refund for the taxable years 1964 and 1965. He neither mentioned nor pressed these claims on brief. We therefore do not consider them. Petitioner did not contest some of the determinations in the statutory notice of deficiency in Docket No. 103-67. We therefore hold those determinations to be conceded. The issues left for decision are: (1) whether the gain which petitioner *105 realized from the subdivision and sale of real property is taxable as capital gain without considering section 1237, [1] and (2) if the first issue is determined in the negative, whether said gain is taxable as capital gain in whole or in part by virtue of section 1237. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Carl S. Dahlstrom (hereinafter referred to as petitioner) filed Federal individual income tax returns for the taxable years 1964, 1965, and 1966 with the district director of internal revenue, Tacoma, Washington. He was a legal resident of Bellevue, Washington, when he filed the petition in this case. From 1935 to 1946 petitioner was a professional hockey player. In the spring of 1946, he retired from hockey and moved to the Seattle, Washington, area. During the next two years he was a real estate salesman, first for a realty company and next for a construction company. In 1948 he passed a real estate broker's examination and began his own realty company. In October 1954 *106 petitioner was approved as a candidate for Member of Appraisal Institute (hereinafter referred to as M.A.I.) designation of the American Institute of Real Estate Appraisers. On July 1, 1955, he left the real estate brokerage field and entered the real estate appraisal field, working on a fee basis. Since that date he has not sold any property for a commission. He works full time, from 35 to 40 hours a week, as a real estate appraiser. During the years here in issue, he earned the following amounts of gross income in his appraisal business: 1964
$17,872.74
1965
15,184.00
1966
21,033.75
Petitioner was awarded the M.A.I. designation in November 1959. One 960 requirement for holding this designation is some form of membership in the National Association of Real Estate Boards or in a local member board. Having an active real estate broker's license is one way to satisfy this requirement. While there are other ways to satisfy the requirement, petitioner has done it by maintaining his real estate broker's license. This is the only reason he has continued to hold the license. The license limits him to selling "for and on behalf of" Butler and Walls, the firm for *107 which he works. Butler and Walls does no selling; it does apraisals only. On April 17, 1953, petitioner, Phil Bessor (hereinafter referred to as Bessor), Tom Brennan (hereinafter referred to as Brennan), and their spouses, as partners, entered into a contract to purchase a 25-acre tract of land for $75,000. The contract required a downpayment of $21,750. It required the balance to be paid in installments of $28,250 on Paril 17, 1954, and $25,000 on April 17, 1955, with interest at 5 percent per annum, paid semi-annually. The purchasers agreed that each couple would pay one-third of the downpayment, the two installments, and the interest. While the purchasers bought the property jointly, they had no written partnership agreement. The land which petitioner and his copurchasers bought (hereinafter referred to as View Haven) is located in Clyde Hill, Washington. View Haven is approximately ten miles, or a 20-minute drive, from downtown Seattle. It is in the center of a broad peninsula which cuts into Lake Washington. It is well located to afford a good view of the lake, the city of Seattle, and the surrounding mountains. Because of View Haven's proximity to Seattle, and because of *108 its scenic location, petitioner and his copurchasers bought it with the intention of subdividing it into residential lots and selling them individually. One of petitioner's copurchasers, Brennan, worked in a stock brokerage office. Bessor, another copurchaser, was a civil engineer. The copurchasers had an understanding that Bessor would do any engineering required to subdivide View Haven. Early in 1954 Brennan and Bessor notified petitioner that they were unable to pay their shares of the installment due on April 17, 1954. Petitioner thereupon decided to buy the Brennans' and Bessors' interests in View Haven and make the remaining payments himself. On April 9, 1954, the Brennans and the Bessors quit-claimed their interests to petitioner and his wife in return for a mortgage of $14,519.37. At about this time petitioner borrowed sufficient money from the Washington State Bank to pay the installment due on April 17. As security for the loan he increased an existing mortgage on his personal residence. The change from joint to single ownership in View Haven forced petitioner to change his plans with respect to the property. Because of the change in ownership he was heavily in debt *109 and was not able to proceed with the subdivision as he and his copurchasers had originally intended. He therefore decided to hold View Haven as a long-term investment. Petitioner paid the mortgage due to the Brennans and Bessors by March 5, 1956. By May 1957 petitioner had paid both the final installment on the View Haven contract and his loan from the Washington State Bank. Prior to or during October 1953, Bessor drew a plat covering approximately onethird of View Haven. The plat divided the area into 14 lots. The platted area was called View Haven, Division A (hereinafter referred to as Division A). Division A is in an area zoned for single-family dwellings. On October 24, 1953, petitioner and his then co-owners submitted the Division A plat to the Clyde Hill council. The Clyde Hill council approved the plat on November 12, 1953. At the time Division A was platted, Clyde Hill ordinances provided that a plat could be approved only if the platter put in the streets shown on the plat in accordance with Clyde Hill street specifications or, in lieu thereof, posted a bond to insure that the streets would be properly installed. Clyde Hill required streets to be graded, surfaced, *110 and paved. Prior to paving, proper storm drainage facilities had to be installed. Furthermore, Clyde Hill did not allow streets to be torn up after they were completed. This latter requirement necessitated the installation of underground utilities prior to paving. Petitioner and his then coowners chose to post a bond rather than complete the necessary improvements. They therefore obtained a bond in the approximate amount of $8,000. In 1954 petitioner had a storm drainage system put into Division A. He then had 961 some underground utilities installed. In 1956 he had water mains put in. In 1957 he had the streets completely graded and partly paved. The total cost of his improvements to Division A was approximately $30,000. [2] Petitioner did not have to pay for gas mains because the local gas company installed them free of charge. Petitioner understood that all the improvements he caused to be made to Division A were required by or necessitated by local ordinances. As such he considered them necessary to obtain a release from his bond to insure improvements. He ultimately obtained this release *111 by completing all the improvements entailed by the Division A plat. Petitioner decided to use one of the lots in Division A for his own home. He started building the home in the spring of 1957. This left 13 lots to sell. Petitioner made no effort to sell these lots. He did not list them with a real estate office. He never advertised their availability for sale. Nor did he put "For Sale" signs on them. In one corner of View Haven there was a permanent, lighted plat sign made out of stone and cedar with one-foot letters spelling "View Haven." This was not, however, a "For Sale" sign. It was simply to identify the land which had been platted as "View Haven." Most subdivisions in the area have a plat identification sign similar to the one on View Haven. The following table summarizes the sales of the 13 available lots in Division A: Date of Sale
Buyer
Price
Circumstances of Sale
1
11/23/53
Johnson
$10,500
Buyer contacted petitioner and his then co-owners. Buyer wanted to remodel an old house located on one of the lots.
2
7/1/57
David
6,850
Buyer contacted petitioner. Petitioner was reluctant to
Buyer contacted petitioner. Petitioner was reluctant to sell, because the streets were not complete. Buyer per- sisted and petitioner finally sold.
3
9/ 3/57
Fallick
10,500
Same circumstances as sale #2.
4
7/ 7/58
Johnson [1]
7,500
Realtor brought purchaser to petitioner.
5
7/11/58
Scott
7,500
Realtor brought purchaser to petitioner.
6
9/26/58
Ward
8,000
Buyer contacted petitioner.
7
5/ 1/59
Putnam
7,500
Buyer contacted petitioner. Buyer wanted to build a house in the area of View Haven.
8
5/ 1/59
Hagen
9,000
Buyer and Putnam were neighbors in South Bellevue. They contacted petitioner together. Buyer, like Putnam, wanted to build a house in the area of View Haven.
9
12/ 8/61
Mason
9,500
Realtor brought purchaser to petitioner.
10
11/19/62
Root
10,000
Buyer was a part-time employee of the firm where petitioner worked. Buyer initiated discussions which culminated in a sale.
11
5/ 9/63
Falkner
10,950
Realtor brought purchaser to petitioner.
12
12/12/63
Stolov
10,950
Realtor brought purchaser to petitioner.
13
1/ 2/64
Wallace
9,750
Buyer contacted petitioner.
*112 On sales 4, 5, 9, 11, and 12, where realtors brought the buyers to petitioner, he paid full commissions of 10 percent of the sale price to the realtors. It is customary for the seller to pay the real estate commission even if the buyer contacts the realtor. By 1959 petitioner and the other people living in Division A discovered that their septic tank systems were not functioning properly. Most of the land was too moist to absorb the septic effiuent. Because of the unattractive and unhealthy condition resulting from this, petitioner and his neighbors decided to have a sewage disposal system installed. They therefore signed an agreement to pro rate the cost of the system on a lot basis. The only possible way to install a sewer system in Division A was to go through part of the unplatted portion of View Haven. In order to get the sewer system approved it was necessary for petitioner to have the affected portion of View Haven platted. On January 28, 1960, he therefore had the American Engineering Co. (hereinafter referred to as American Engineering) draw a plat covering approximately one-half of the unplatted *113 area of View Haven. The plat divided the area into 13 lots. The platted area was called View 962 Haven, Division B (hereinafter referred to as Division B). Division B is contiguous to Division A and is zoned for singlefamily dwellings. Petitioner's primary reason for having Division B platted was to facilitate the installation of a sewer system in Division A. When petitioner had Division B platted he was subject to the same Clyde Hill ordinances that were in effect when Division A was platted. Rather than complete all the improvements required by the ordinances prior to getting the Division B plat approved, petitioner chose to post a performance bond. He therefore obtained a bond in the approximate amount of $18,000. On August 19, 1960, petitioner entered into a contract with the National Construction Co. to install a sewer system in Divisions A and B. He entered into the contract on his own behalf and as agent for his neighbors in Division A. Aside from the installation of sewer lines, petitioner worked through American Engineering to bring about improvements to Division B. Americnl Engineering appeared before the Clyde Hill council in connection with the platting of Division *114 B. It also prepared detailed specification sheets on physical improvements and distributed them to local contractors for bidding. Once the bids were in, American Engineering helped petitioner select the contractor for the various jobs. After choosing a contractor, petitioner and American Engineering notified him by letter to begin work. As a result of working through American Engineering, petitioner did not spend much time on the details of developing Division B. The following table shows the improvements which were made to Division B through the end of 1964: Description
Amount
Engineering
$ 6,892
Filling, draining, leveling, clearing
4,993
Storm sewers
4,601
Sanitary sewers
5,425
Sewer district assessment
6,953
Water mains
9,131
Underground utilities
3,146
Paving
7,720
Street lights
815
Gas mains 0
Total
$49,676 Petitioner paid for all improvements to Division B with his own funds. Petitioner understood that all the improvements he caused to be made to Division B were required by or necessitated by local ordinances, except for the installation of street lights. As such he considered all the improvements except street lights necessary *115 to obtain a release from his bond to insure improvements. He obtained this release when he completed all the improvements entailed by the Division B plat. Early in 1963 two salesmen from John L. Scott, Inc. (hereinafter referred to as Scott), a local real estate office, approached petitioner with the idea of arranging a single sale of the entire Division B in its then present condition. After discussing the idea, petitioner gave Scott an exclusive listing to sell Division B for $117,000. The original listing, dated January 22, 1963, was to last for 30 days, but petitioner extended it for nine months. No offers were received during the nine-month period. During this period Scott placed some signs on the property. It did not, however, advertise the availability of the property for sale in the newspapers. Petitioner has made almost no effort to sell the 13 lots in Division B. Until 1967 he did not list them with a real estate office. On February 14, 1967, he gave Scott an open listing on the lots which then remained unsold. He never advertised the availability of the lots for sale. Nor did he put "For Sale" signs on them. The following table summarizes the sales during 1964, 1965, *116 and 1966 of lots in Division B: Date of Sale
Buyer
Price
Circumstances of Sale
1
8/20/64
Hone
$15,500
Buyer contacted petitioner. Buyer wanted to build a house in the area of View Haven.
2
7/14/65
Morgan
16,500
Realtor brought buyer to petitioner.
3
7/20/65
Lumer
16,500
Realtor brought buyer to petitioner.
4
2/ 3/66
Leland
15,000
Realtor brought buyer, a house builder, to petitioner.
5
2/19/66
Boyd
16,000
Realtor brought buyer to petitioner.
6
4/29/66
Leland
15,500
Buyer in sale #4 sold the house he had built on that lot and wanted to build on a second lot. On sales 2 through 6 petitioner paid commissions to the realtors who contacted him with the buyers' offers. Realtors in the Clyde Hill area were generally aware of 963 the availability of lots in Division B. It is customary for realtors to obtain information about property which is available for sale and thus increase the amount of real estate which they can show to prospective buyers. Scott, for example, contacted petitioner in 1964 to get information about the lots in Division B and kept this data on file. The following table shows the prices at which petitioner *117 hoped to sell the seven lots in Division B which were unsold at the end of 1966: Lot Number
Price
4
$16,500
5
14,000
6
15,000
7
14,000
8
13,500
9
15,000
10
15,500 Petitioner sold two of these lots in 1967. View Haven is located in an area where land values have been rapidly appreciating over the past fifteen years. Petitioner owned interests in real estate other than View Haven during years relevant hereto. Sometime after 1948, when he became a licensed realtor, petitioner built a real estate office in Bellevue, a city contiguous to Clyde Mill. When petitioner quit his real estate brokerage business in 1955 he leased the office to Lowell G. Gibson ads his wife. He sold the office in 1957 to the Washington State Bank. Petitioner also owned two undeveloped tracts, one in Bellevue and one in South Bellevue, which he purchased before or during 1951. He was holding these for investment purposes at the time of the trial herein. From June 28, 1955, to December 31, 1966, petitioner did not purchase any real estate. However, on April 12, 1965, he purchased a limited partnership interest in a partnership which owned an apartment house. [3]
*118 Petitioner's wife died on May 5, 1958. Her estate was probated in King County, Washington. Gail Bette Dahlstrom, a pretermitted child, received as her intestate share of the estate one-half of the View Haven acreage remaining after platting Division A. With respect to the sale of lots in Division A, petitioner originally reported all gains on his income tax returns as ordinary income. Claims for refund have been filed for the open years 1963 and 1964 [4] on the ground that gain from the sale of lots in Division A is capital gain. In his Federal income tax returns for 1964, 1965, and 1966, petitioner treated his gain from the sale of lots in Division B as capital gain. In his statutory notices of deficiency for 1964, 1965, and 1966, respondent treated petitioner's gain from the sale of lots in Division B as ordinary income. Opinion The first issue is whether gain which petitioner realized from selling lots in Division B is taxable as capital gain without considering section 1237. The parties agree that the issue *119 hinges upon the question whether petitioner held View Haven "for sale to customers in the ordinary course of [a] trade or business" within the meaning of section 1221(1). [5]
The question presented has been litigated numerous times. While opinions dealing with the question often appear inharmonious, certain areas of agreement emerge. Courts agree that it is not necessary to review the decided cases in detail, because the question must be resolved on the basis of the peculiar facts of each case. Furthermore, *120 there are various factors which might help to reach a decision. Among these are the purpose for which the property was acquired, the length of time the property was held, the extent of improvements made to the land, the nature and extent of the taxpayer's primary business, whether the taxpayer purchased new land to replace the lots he sold, the number and frequency of sales, the amount of promotional or advertising activity carried on, and the extent to which the taxpayer personally engaged in developing and selling the lots, either directly or through an agent. Finally, courts agree that no single factor is controlling and that the weight to be given a factor varies with each case. 964 The ultimate question we must resolve, with the help of factors such as those listed above, is for what purpose did petitioner hold View Haven. Mauldin v. Commissioner, 195 F. 2d 714, at 717 (C.A. 10, 1952), affirming 16 T.C. 698 (1951); S.O. Bynum, 46 T.C. 295, at 299 (1966). Did petitioner hold the land as an investment? Or did he hold it for the purpose of engaging in a real estate business, using the land as inventory or stock in trade? On the basis *121 of the record as a whole, we think petitioner proved that he did not hold View Haven for the purpose of engaging in a real estate business. The partnership acquired View Haven with the intention of subdividing it and selling individual lots. When petitioner acquired it in his own right, however, his purpose was to hold it as a long-term investment. View Haven is located in an area where land values have been rapidly appreciating over the past fifteen years. [6] When petitioner attained a financial position to develop his investment, he made only minimal improvements to the land. He understood all the improvements to be required or necessitated by local ordinances. He spent very little time personally in arranging for the improvements. He personally did no advertising or promotional work in connection with View Haven; he did not even put up "For Sale" signs. During the ninemonth period when Scott had an exclusive listing to make a single sale of Division B, it did only minimal advertising, consisting mainly of a few signs on the property. During the time which elapsed between petitioner's acquisition of View Haven in his own right and the end of the last taxable year here in issue, a *122 period of almost twelve years, petitioner made only eighteen sales in connection with View Haven. The most sales he made in any one year was three. In 1954, 1955, 1956, and 1960 he made no sales. He did not solicit the sales he made. The buyers either contacted him directly or approached him through realtors which they contacted. Petitioner did not buy additional land to replace lots which were sold. During the years here relevant he had a full-time job as an appraiser from which he earned very substantial amounts of money. This case is factually distinguishable from the cases cited by respondent. In view of the nature of the question before us, we do not think a detailed discussion of these cases is necessary. On the basis of the record as a whole, we conclude that petitioner did not hold View Haven "for sale to customers in the ordinary course of [a] trade or business" within the meaning of section 1221(1). We accordingly hold that his realized gain from the sale of lots in Division B is taxable as capital gain without considering section 1237. *123 In view of our disposition of the first issue, it is not necessary to consider the second issue. See section 1.1237-1(a)(4)(i), Income Tax Regs.
Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. This includes the installation of sewer mains in 1960, as described later.↩
1. The buyers in sales #1 and #4 were apparently different people.↩
3. The record indicates that petitioner owned a house in Seattle which he rented out for awhile and then sold. The record does not, however, indicate when he owned the house.↩
4. As we point out above, we do not pass on the refund claim for 1964, although that year is before us with respect to the deficiency which respondent determined.↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
6. Respondent's own witness testified that Clyde Hill has been "a good appreciating area" with respect to real estate values.↩