S. O. BYNUM AND FANNIE R. BYNUM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5226–63. Filed June 3, 1966.

*S. P. Keith, Jr.*, for the petitioners.
*Robert G. Faircloth*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income taxes for the calendar years 1960 and 1961 in the amounts of $4,512.68 and $3,220.02, which latter amount includes an asserted addition to the tax under section 6654(a) of the Internal Revenue Code of 1954[1] in the amount of $15.95. The only issue now remaining for our decision is whether admitted gains from sales of real estate during the years in issue are taxable as ordinary income or as long-term capital gain. Requisite mathematical adjustments as to allowable medical expenses may be dependent upon our determination of such issue.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found.

Petitioners S. O. Bynum and Fannie R. Bynum are husband and wife residing in Tuscaloosa, Ala., and for the years in issue they filed their joint Federal income tax returns with the district director of internal revenue, Birmingham, Ala. In said return for 1960 they showed the sales of 12 subdivided lots in Morayshire Estates to 9 sep-

---

[1] All statutory references are to the Internal Revenue Code of 1954.

arate vendees for a total sales price of $40,075 (resulting in total gain of $28,749.78) and in their 1961 return they showed the sales of 8 similar lots to 7 separate vendees for a total sales price of $31,035 (resulting in total gain of $21,020.45). The amounts shown as the total gains in each year are not contested by respondent.

The subdivided lots sold in 1960 and 1961 were originally a part of the farm of about 113 acres which petitioners[2] first leased in 1936. It is located on the Greensboro Road at the edge of the city of Tuscaloosa, Ala., and is approximately 3½ miles from downtown Tuscaloosa. Petitioners have continuously used a portion of the tract for growing trees, plants, and shrubbery in connection with a nursery and landscaping business owned and operated by them and known as Southern Tree & Landscaping Co. Petitioners have also lived on this farm since about 1941 and have maintained an office separate from their residence on the farm since 1940 or 1941. From this office they have conducted all activities related to their nursery and landscaping business such as keeping records, preparing landscaping proposals, drawings, bids, etc.

Petitioners purchased this farm in January 1942, and although the record is not clear as to the price they paid, it indicates an allocated cost of $250 to each of the lots sold during the years in issue, and we so find.

Petitioners have had varying acreages of the farm under cultivation in connection with the nursery and landscape business; the maximum so employed being about 50 acres and the amount so employed during the years in issue being about 35 acres. Apparently none of this acreage was subdivided or sold. Also in connection with such business they maintained and used a small barn for the storage of equipment, etc., and a lattice shed of approximately 13,000 square feet for the growing of tender plants and shrubs.

Through the years and during the years in issue petitioners regularly employed 8 to 12 workmen in the nursery and landscaping business and petitioner husband personally supervised and participated in all phases of the planning and work for subject business, acting as his own foreman and superintendent and even working on Sundays a good portion of the time.

Petitioner wife apparently spent little or no time in connection with selling the subdivided lots during the years in issue and respondent does not contend otherwise. Petitioner husband spent 90 or 95 percent of his time during the years in issue in connection with the nursery and landscaping business and spent the other 5 or 10 percent in spasmodic intervals of subdividing and selling activities.

---

[2] Record title has been variously held by the petitioners but since joint returns were filed this is not meaningful and the plural, petitioners, will be used throughout.

During 1960 sales of the shrubbery and landscaping business amounted to $27,435.43, which resulted in net income of $606.55. During 1961 such sales were $24,250.29, resulting in a loss of $4,321.74.

At some time prior to 1958 petitioners suffered losses in their landscaping and nursery business and began borrowing money from the City National Bank of Tuscaloosa, Ala. The record does not show how these loans were originally secured but by October 1958 they totaled $70,000 and had been questioned and partially charged off by national bank examiners. At about this same time such bank was acquired by new owners or acquired new management and the loans were combined and secured by a mortgage on the subject 113-acre farm. At the same time the bank put and continued heavy pressure upon petitioners to pay off or at least reduce such loan.

During 1959 the bank suggested that petitioners should sell the farm in order to pay off their loan and sent a prospective purchaser to talk with them. Such prospect made an offer of about $40,000 for the farm "as is" and petitioners discussed the matter with several realtors and concluded that they could not realize more than this without subdividing and improving. During the years in issue, absent petitioners' subdividing and improving activities, the farm would have had a fair market value of $450 per acre.

Late in 1959 petitioners finally decided to improve and subdivide a portion of their farm. In this connection they worked out an arrangement with the bank for partial releases from the mortgage on payments of about $2,750 for each lot sold, the average selling price of the lots, which were about six-tenths of an acre each in size, being a little under $4,000 each.

By September 1960, 38 lots had been subdivided and improved as follows:

| Item | Amount |
|---|---|
| Streets | $6,117.60 |
| Water | 4,278.13 |
| Sewerage | 5,449.10 |
| Curb, gutter, drainage | 3,708.98 |
| Other | 5,210.16 |
| Total | 24,763.97 |

This amounted to about $650 for each of the 38 lots and to almost $1,100 per acre.

There was no further improvement or subdivision until 1962 when an additional 17 lots were similarly created at a development cost of $22,543.97, or about $1,300 for each of the 17 lots. The initial subdivision of 38 lots consumed between 20 and 25 acres of the 113-acre farm. Petitioners have purchased no additional land.

Petitioners had the formal opening of their subdivision which they called Morayshire Estates, on Sunday, September 11, 1960. It was

announced by a full-page advertisement in the Graphic, a magazine-type newspaper circulated in Tuscaloosa, on September 8, 1960, and also by a full-page ad in the Sunday, Tuscaloosa News newspaper on September 11, 1960. Both of these ads advised the public to contact S. O. Bynum "or your favorite realtor." Petitioners also inserted a 2½ by 5-inch advertisement regarding the subdivision in the yellow pages of the 1961 Tuscaloosa telephone directory. In the newspaper and Graphic ads both daytime and nighttime telephone numbers were given for S. O. Bynum, and the newspaper ad purported to offer 73 lots (although only 38 had then been subdivided) and announced "160 Lots to Be Developed Later."

Petitioners listed their subdivided lots with all of the reputable realtors in and around Tuscaloosa, Ala., and neither of them sought or obtained a realtor's license; we conclude however, that all of the sales of lots during the years in issue were made by petitioner husband since no real estate commissions were paid.

## OPINION

We are here concerned with the proper application of the language of two sections of the Code to the facts in this case. The sections are 1221(1) and 1231(b)(1)(B). The statutory language in the two Code sections is identical. It is, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 1221 is the section which defines capital assets and the above-quoted language is an exclusion from the defined class. Section 1231 sets out special rules applicable to sales of property used in taxpayers' trade or business and again the above-quoted language is an exclusion from such special rules.

Petitioners in the instant case seek long-term capital gain treatment for the profits on the sales of lots subdivided out of their farm. The question or issue for our determination under each of the above-noted sections of the Code is singular; it is whether the taxpayers during the years in issue were in the real estate business and selling property held by them primarily for sale to customers in the ordinary course of such trade or business. The burden of proof, to establish the negative of this proposition, is on petitioners, and we recognize, as we must, that the capital gain provisions, being an exception to the normal-tax rates, are to be construed narrowly. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955).

The Supreme Court in the recent case of *Malat* v. *Riddell*, 383 U.S. 569 (1966), vacating and remanding 347 F. 2d 23 (C.A. 9, 1965), has held that where the acquisition and holding of property was for a dual purpose (either to develop for rental, or to sell) that a "substantial" purpose is not necessarily the "primary" purpose, but that the statutory word "primarily" means "of first importance" or "princi-

pally" and that "The purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand (*Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. (*Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134.)" Our considerations of the facts in the instant case have all been in the light of such teaching; however, we note at the outset that we are not dealing with such a dual purpose as concerned the Supreme Court in *Malat*, but with a change in purpose between the time the petitioners purchased this farm in 1942 and the sales at issue which occurred in 1960 and 1961.

The respondent contends only that the property here involved was being "*held*" by petitioners primarily for sale in the ordinary course of business at the times the sales occurred. The statutory word is "held" and the law is now well settled that no more is required. The taxpayers' purpose at the time of acquisition has evidentiary weight, but the end question is the purpose of the "holding" at the time of the sale or sales. As stated in *Mauldin* v. *Commissioner*, 195 F. 2d 714, 717 (C.A. 10, 1952):

While the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which it was held. * * *

Admittedly, Mauldin originally purchased the property for purposes other than for sale in the ordinary course of trade or business. When, however, he subdivided and offered it for sale, he was undoubtedly engaged in the vocation of selling lots from this tract of land * * * .

See also *Pool* v. *Commissioner*, 251 F. 2d 233 (C.A. 9, 1957); *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960).

Without any notable exceptions the many, many cases in this particular field have noted that each individual case must be considered and evaluated on its peculiar and particular facts, e.g., *Kelley* v. *Commissioner, supra; Pool* v. *Commissioner, supra; Lazarus* v. *United States*, 172 F. Supp. 421 (Ct. Cl. 1959). As stated in *Lazarus*, "Perhaps the only guiding principle of general application that can be gleaned from the judicial decisions dealing with the problem * * * is that every case of the type mentioned must be decided on the basis of its own facts, there being no single test that can be applied to all such cases with decisive results." For this reason we have endeavored to make our findings of fact in the instant case full and comprehensive.

Petitioners' position, of course, is that they were simply passive investors engaged in liquidating a portion of their farm to their best advantage in order to satisfy their mortgage, after having ascertained that on a single sale of the entire property they would have realized less than the existing mortgage. We cannot agree with petitioners' position since we believe it is not supported by the facts.

In 1959 petitioners were under pressure from the bank to pay off, or substantially reduce their $70,000 mortgage. They examined into their situation and concluded that an outright sale of the farm "as is" would still leave them in debt and that they would realize very much more if they improved and subdivided before selling.

To this end they spent over $1,000 per acre on the 20 or 25 acres which comprised the first subdivision of 38 lots. This amount was more than double either the allocated fair market value of such acreage or petitioners' original cost, and must be considered substantial. Cf. *Wellesley A. Ayling*, 32 T.C. 704.

Petitioners' position that they were trying to do just enough to get out of debt is not supported by the facts. Under their arrangement with the bank, $2,750 was paid on the mortgage for every lot sold, consequently the proceeds from 26 lots would have more than amortized the mortgage. But petitioners' efforts went far beyond this. Their initial subdivision was 38 lots, their advertising indicated that a total of 233 lots would eventually be offered, and 17 additional lots were in fact subdivided in 1962. This is not the posture of a passive investor who improved his property simply to make it more readily acceptable. *W. T. Thrift, Sr.*, 15 T.C. 366; *Wellesley A. Ayling, supra*.

Nor are petitioners in the same position as the taxpayer in such cases as *Fahs* v. *Crawford*, 161 F. 2d 315 (C.A. 5, 1947), and *Smith* v. *Dunn*, 224 F. 2d 353 (C.A. 5, 1955), where the improving and selling activities as to the property were completely turned over to a third party under contractual arrangements which left taxpayer free of details. Petitioners here personally conducted all phases of the considerable improving, subdividing, and promotional activities, and the record indicates that petitioner husband personally made each of the sales we are considering during the 2 years before us. The fact that the subdivided lots were "listed for sale" with various local realtors is of little moment when considered against this background. Petitioners urge that petitioner husband continued to spend 90 to 95 percent of his time on the nursery and landscaping business, only devoting the remaining 5 to 10 percent to all the above activities. We do not doubt that petitioner husband remained in the nursery and landscaping business during 1960 and 1961, but we are convinced, from all the facts of record, that during these years he had entered into, and was actively engaged in, a second business—that of selling the subdivided lots from petitioners' farm—and that such property was then held by petitioners primarily and principally for sale to customers in the ordinary course of that business, and that this purpose was of first importance to petitioners. See *Morris W. Zack*, 25 T.C. 676, 680–681, affd. 245 F. 2d 235 (C.A. 6, 1957).

The purchase and sale of the hoists was not a part of any other business regularly carried on by Zack, but it has long been recognized that a taxpayer may be engaged in several businesses. The question is whether Zack and his associates were selling the bomb hoists in the ordinary course of a business carried on by them. The only purpose in buying the bomb hoists was to resell them at a higher price. There was no "investment" such as might be made in other types of property, but on the contrary there was a general public offering and sales in such a manner that the exclusion of the statute cannot be denied.

\* \* \* The activities amounted to the carrying on of a business of selling the bomb hoists and the sales were to customers in the ordinary course of that business. \* \* \*

See also *Oliver* v. *Commissioner*, 138 F. 2d 910 (C.A. 4, 1943).

That this purpose had become of first importance to petitioners is confirmed by the more extensive (as to each individual lot) improvement activities engaged in in 1962 when the expenditures as to each of the 17 lots then subdivided amounted to $1,300 as against the $650 spent on each of the first 38 lots. In our view, petitioners were engaging in the business of adding extensive improvements to real estate, and then selling those improvements at a profit. Cf. *Morris W. Zack*, *supra*.

The record facts indicate that the value of the raw land of petitioners' farm had appreciated very little since 1942, such appreciation amounting to about $35 per acre, yet the gain on the approximately 13 acres sold during the years at issue amounted to almost $4,000 per acre. We cannot believe that gain of this character was contemplated by the Supreme Court in *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130 (1960), when it said at page 134:

This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. *Burnet* v. *Harmel*, 287 U.S. 103, 106. \* \* \*

We do believe that the gain here was generated by petitioners' actions and activities with regard to this property, *George R. Kemon*, 16 T.C. 1026, 1032–1033 (1951); *Frank* v. *Commissioner*, 321 F. 2d 143, 151 (C.A. 8, 1963); *Galena Oaks Corporation* v. *Scofield*, 218 F. 2d 217, 220 (C.A. 5, 1954), and as such, it is taxable as ordinary income.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TANNENWALD, *J.*, concurring: Since this is the first case reviewed by the Court after *Malat* v. *Riddell*, I think it extremely important that we be crystal clear as to the basis for our decision. Otherwise we will simply provide more fuel for the fires of further litigation in this area.

There are three elements in the identical language of sections 1221(1) and 1231(b)(1)(B):

1. "Primarily" which, as the Supreme Court has mandated, means of "first importance." The element of substantiality is no longer enough. By the same token, the proscribed purpose does not, I believe, have to be capable of a quantitative measurement of more than 50 percent. It should be sufficient if such purpose is *primus inter pares*.

2. "For sale to customers." This is the least significant element. Unquestionably, any person who proposes to sell his property has "for sale" as his purpose. Equally clearly, anyone who buys the property is a "customer."

3. "In the ordinary course of business." This phrase is crucial. Thus, the taxpayer must be in a business of which the sale is a part. In addition, even though a sale is usually the "ordinary" way of disposing of property, it must also be in the "ordinary course" of the business. Thus, a decision by a manufacturer to sell an outmoded plant would not be within the proscribed purpose. These are the distinctions which I think the Supreme Court had in mind when it said in *Malat* v. *Riddell*:

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand (*Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. (*Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134.)

All of the foregoing are essential elements which must be satisfied when the witching hour of sale arrives.

Unquestionably in many cases involving change of purpose, the profit is realized in two parts. One part is properly attributable to the appreciation in value during the period when the property was held for investment. The other part represents the fruits of the business. To tax all of such appreciation as ordinary income where the activity is turned into a business may inflict hardship on the taxpayer; contrariwise, to tax all of such appreciation at long-term capital gains may give the taxpayer an unjustifiable windfall. Perhaps some method of allocation within an appropriate statutory framework is indicated. See Surrey and Warren, Cases on Federal Income Taxation 695–696 (1960).

BRUCE, FAY, and DAWSON, *JJ.*, agree with this concurring opinion.