GERSON A. BUSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent MATHIS R. BUSH and BEATRICE S. BUSH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bush v. Commissioner
Docket Nos. 1691-73, 1693-73.
United States Tax Court
T.C. Memo 1977-75; 1977 Tax Ct. Memo LEXIS 366; 36 T.C.M. (CCH) 340; T.C.M. (RIA) 770075; March 22, 1977, Filed Perry Shields, for the petitioners. Robert B. Nadler, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined the following deficiencies in petitioners' Federal income taxes: Sec. 6653(a) [1] Docket No.
(Petitioners)
Year
Deficiency
Addition
1691-73
Gerson A. Bush
1965
$ 1,559.10
$ 77.96
1967
39,635.61
1693-73
Mathis R. Bush &
1965
1,095.72
214.81
Beatrice S. Bush
1967
28,049.06
*367 Due to concessions by the parties, the sole issue remaining for our consideration is whether the gain realized in 1967 on the sale of the project known as Laurel Heights Apartments is taxable as long-term capital gain or as ordinary income. FINDINGS OF FACT Many of the facts have been stipulated and are found accordingly. Petitioners were residents of Knoxville, Tennessee, at the time their respective petitions were filed. They filed their Federal income tax returns for 1965 and 1967 on the cash basis method with the director, internal revenue service center, Chamblee, Georgia. Mrs. Beatrice S. Bush is a party to this action solely by virtue of having signed the joint returns in controversy in docket No. 1693-73. Accordingly, reference to petitioners will not include Mrs. Bush.Because of facts common to each, docket Nos. 1691-73 and 1693-73 were consolidated for trial. The term "petitioners" will hereinafter be used to designate Gerson A. Bush and Mathis R. Bush. In approximately 1949, Mathis formed his idea to purchase, *368 improve, and rent real property located in the vicinity of the University of Tennessee. In addition to implementing his idea to obtain individual holdings, [2] Mathis combined efforts with his brother Gerson and on January 3, 1957, petitioners organized Gary Construction Company (hereinafter Gary) with each owning 50 percent of the stock. Gary owned several pieces of property and it was Gerson's primary responsibility to look after such properties. In 1960, Mathis and Gerson organized Germat, Inc. (hereinafter referred to as Germat). Each owned 50 percent of Germat's stock and served as its officers and directors. On November 30, 1963, Germat acquired all the assets and liabilities of Gary in a merger. *369 After the merger, Gerson continued his work for Germat and was still primarily responsible for the rental properties. Gerson has never owned any rental property in his own name other than as nominee for Germat, and unlike Mathis, was not involved in the construction business. Gerson was not a licensed real-estate dealer or broker. In addition to his other activities, from approximately 1950 through 1967 Mathis operated a sole proprietorship known as M. R. Bush Construction Company. Through the construction company, Mathis engaged in residential and commercial construction, remodeling, and demolition. The largest single construction project built by Mathis prior to 1966 was a fraternity house at the University of Tennessee for approximately $145,000. From 1967 through the time of the trial, Mathis' largest construction job was a housing project costing approximately $350,000. In October 1965, Mathis' contractor's license was limited to projects of $300,000. The license was increased in April 1966, to $500,000 and increased in October 1968, to $1,000,000. For the year 1965, the company grossed $203,083.15 and had a net income of $13,854.42. In 1967, the company grossed *370 $8,943.33 and had a net loss of $53,837.79. At the time of the trial, Mathis had a license as a real estate broker which was acquired in 1974. In 1963, Germat acquired properties at 1606 Highland Avenue, 1612 Highland Avenue, 309 Sixteenth Street, and a vacant lot to the rear of these properties. Between 1963 and November 1965 Germat used this realty as rental property. These properties originally had been acquired by Germat with the intention of renting them until it became feasible to build an apartment house at that site. Between 1963 and the end of 1965, petitioner discussed the development of these properties into an apartment house with Mike Fear, an engineer with the Tennessee Valley Authority who subsequently prepared certain plans and specifications for an apartment house. In October 1963, the development of a 100-unit apartment building on the property was discussed by petitioners with the architectural and engineering firm of Good and Goodstein. Contact with Good and Goodstein continued, but Germat did not construct the 100-unit building. In January 1964, a permit was obtained to build a 24-unit apartment house on the property, but plans to build the 24-unit building *371 were not implemented. The properties at 1606 Highland Avenue, 1612 Highland avenue, and 309 Sixteenth Street were vacant in the fall of 1965. On November 15, 1965, petitioners caused Germat to sell these properties and the vacant lot (hereinafter referred to as properties acquired from Germat) to themselves. Petitioners acquired the properties from Germat with the intent to construct an apartment house thereon, and to lease it to the University. Petitioners were advised by the certified public accountant then serving Germat, that it would be necessary to sell the property to themselves at its appraised value. In accordance with the accountant's recommendation, petitioners had the property appraised by Jack Flecher of Fletcher Realty, who appraised the land and improvements as of December 10, 1965, at a value of $55,000 and included his findings in a letter to petitioners dated January 26, 1966. At the time petitioners requested Mr. Flecher to make the appraisal, they did not inform him that the properties would be combined with each other or with any other properties for the development of an apartment complex. Petitioners used the results of Mr. Fletcher's appraisal, $55,000, *372 as the total of the sales prices of the November 15, 1965, transactions between Germat and petitioners. [3]
Germat's sales of the properties to petitioners on November 15, 1965, were the only sales of properties reported by Germat for the fiscal year ending June 30, 1966. Except for the 1965 exchange of the property identified as Fox-Lonas for the property referred to as Concord Paynter, Germat did not sell any other properties to petitioners. At the end of 1965, other properties in the general area of those owned by petitioners on Highland Avenue and Sixteenth Street were being developed or had already been developed into high-rise apartment units. Another adjoining piece of property was owned by the University of Tennessee and was improved by an older apartment house called Laurel Heights *373 containing approximately 25 units, but such units were obsolete and the development was not the best use of the University's land. In January 1966, the University of Tennessee needed student housing. Prior to January 6, 1966, petitioners had approached Dr. Edward J. Boling, Vice-President for Development at the University of Tennessee with a proposition to the effect that petitioners would purchase from the University the adjoining tract on which the old Laurel Heights apartment house was situated and would use it together with their parcels for the construction of a 100-unit high-rise apartment house which would be leased to the University of Tennessee for use by it as quarters for married students. As initial conversations progressed, negotiations changed from the 100-unit apartment to a 320-unit apartment preferred by the University because of the acute housing shortage. This proposed 320-unit apartment will be referred to hereinafter as the Laurel Heights Project. Petitioners and their agents Mr. Goodstein and Mr. Good, of Good and Goodstein, attended a meeting with University officials January 10, 1966. At this meeting, those present discussed tax-exempt financing similar *374 to the financing used for the development of a previous University apartment complex known as Golf Range with which Mr. Good had been involved. For the Golf Range Project, a not-for-profit corporation was chartered. The not-for-profit corporation leased the building to the University and the University was responsible for the operation, maintenance, taxes, insurance, occupancy, etc. After construction was completed, the developers of the Golf Range Project were paid and then they were completely out of the transaction. On January 16, 1966, petitioners submitted to the University outline specifications for the Laurel Heights Project which had been prepared by Good and Goodstein. Through the first several meetings it had been petitioners' desire and intention to retain ownership and lease, rather than sell, the Laurel Heights Project. However, in a memorandum dated January 24, 1966, to President A. D. Holt, Edward J. Boling, Vice-President for Development, noted that Good & Goodstein acting for petitioners had submitted a proposal to construct a 320-unit apartment building to be financed by a plan similar to the financing of the Golf Range apartments. Although initial negotiations *375 involved some discussion of petitioners retaining ownership and leasing it to the University, this January 24 memorandum as well as subsequent actions by all involved indicate that it was clear that petitioners or their assigns would sell the completed project outright, either to a nonprofit corporation, or directly to the University. This approach was preferred by the University because it reduced financing and tax costs so that the units could be rented to students as inexpensively as possible. Petitioners by themselves did not have the expertise to build a 320-unit project. From January 1966 on, it was apparent that a contractor with capability to build the larger project was needed and that petitioners at a minimum would have to join forces with a firm with the necessary resources and expertise. A project of this size also required additional land. Acting on behalf of himself and his brother, Gerson acquired options to purchase adjoining tracts known as 1625 Laurel Avenue and 1600, 1616, 1624, 1630, and 1634 Highland Avenue. The option on 1625 Laurel Avenue was acquired on January 17, 1966, and would have expired on May 17, 1966, but for the fact that when the owners *376 refused to extend the same, Mathis and Gerson entered into a contract to purchase the property on or before November 1, 1966. By agreement of the parties, the closing date of the purchase subsequently was extended to November 21, 1966. The options on 1600, 1616, 1620, 1624, 1630 and 1634 Highland Avenue were obtained on January 25, 1966, and would have expired on September 1, 1966, except that in August such options were extended to December 1, 1966. The consideration paid for the options and the renewals was nominal in amount in comparison to the option prices. The amounts paid for the options were applicable in each case to the purchase price. While Gerson was obtaining the options, negotiations were continuing with the University concerning the development of all of the properties into a high-rise apartment project. On January 31, 1966, Henry F. Morse, a University official requested petitioners to submit to the University a firm proposal for the purchase of the property owned by the University to be combined with the other properties for development and then to be leased to the University with an option to buy.Read in light of the prior and subsequent negotiations, and *377 the memorandum dated January 24, 1966 (mentioned previously), implicit in the letter from Morse was the understanding that the long-term lease with an option to buy would be between the University as lessee and a tax-exempt corporation to be formed as lessor, along the model of the Golf Range project. On February 1, 1966, petitioners entered into an agreement with Good and Goodstein for the performance of services relating to the Laurel Heights project. The agreement specified that Good and Goodstein would furnish plans, specifications and other architectural services necessary for the construction of the apartments. In addition, the agreement provided that Good and Goodstein would furnish assistance in obtaining bond financing and provide "sales effort, our good will and negotiating services" with the University on petitioners' behalf. The services were to be completed and paid for in stages. Of the total base fee of $149,200 outlined in the agreement only $1,000 was paid by petitioners to Mr. Good's firm by reason of this agreement. Between January and April 20, 1966, Mr. Good prepared a standard letter which was sent to many underwriters. In this letter, Mr. Good described *378 petitioners as developers, sponsors, and contractors and represented that petitioners would construct the building or do it in joint venture with another contractor. One of these letters, [4] dated April 20, 1966, was sent to Mr. Richard Heagy of Henderson, Few and Company, bond underwriters. By letter dated May 18, 1966, Mr. Heagy wrote to Mr. Good as agent for petitioners and proposed to finance the lease/sale proposal for the development of Laurel Heights Project.[5]
*379 In May and June petitioners continued negotiations with the University. During these negotiations the focus changed from a proposal for a long-term lease with an option to buy, using a tax-exempt organization as lessor, to a proposal for an immediate sale of the project upon completion to the University, using a tax-exempt organization solely to finance construction. The negotiations with the University resulted in a letter dated June 24, 1966, from the University to petitioners in which the University expressed its intention to enter into a contract with petitioners or their nominees or assigns in the development of the project. The letter of intent was requested in and based upon petitioners' proposals in a letter dated June 21, to sell to the University the Laurel Heights project for $4,975,000. The University's letter of intent was conditioned upon, among other things, the following: 1. That you shall request execution of the contract on or before September 1, 1966, or by an extended date previously agreed upon by you and the University. 2. That you shall then have a written commitment for financing the erection and equipping of the building and improvements.
3.That *380 you shall then have all necessary permits issued by the City of Knoxville for the erection of the project. 4. The proposed contract shall contain, along with the usual provisions, specific provisions covering the following: * * *
(5) The contract shall provide for conveyance to the University of the fee simple title to the land, buildings, improvements, * * * (8) The contract shall provide that you, your nominee, or assigns shall have the project completed and ready for occupancy by the University not later than July 1, 1968, unless such completion date is extended because of an Act of God, war, strikes, etc., which would slow down construction work. In an attempt to complete the project, Mathis had contacted three contractors and was left with the impression that there was little or no money to be made in constructing the project. Since petitioners did not have the capability to construct the project on their own, Mr. Good, with a view toward protecting his interest in potential fees, contacted other developers to see if they were interested in buying out petitioners. In June or July of 1966, Good approached Earl S. Worsham and Melvin Goldberger both of whom had *381 prior experience in developing projects of the magnitude of the Laurel Heights Project. After reviewing the project, Worsham advised Good that he and his associate were interested only if they could buy out petitioners' interest and take the project over in its entirety. Worsham also conditioned their interest on the provisos that petitioners assemble all the property necessary and that the University honor the letter of intent. Worsham and Goldberger were not interested in purchasing the properties acquired from Germat by petitioners except as part of the entire tract. Mr. Good arranged for negotiations between petitioners and Worsham and Goldberger. Worsham and Goldberger organized a corporation known as G.W.G. Realty and Investment Company (hereinafter referred to as GWG) and used it for the sole purpose of buying out petitioners' interest in the Laurel Heights Project. Worsham and Goldberger each owned 50 percent of the stock in GWG and were its principal officers and directors.Acting for GWG, Worsham was in contact with W. F. Holt and Sons, Inc., the eventual builder of the Laurel Heights Project, in June, July, and August of 1966. Demolition permits for the Laurel Heights *382 Project were obtained by petitioners in late June 1966. On July 8, 1966, Mathis acquired a building permit to build the Laurel Heights apartments on the land at Laurel Avenue and Highland Avenue. W. F. Holt and Sons, Inc., was listed as the builder; Good and Goodstein was listed as the architect; and petitioners were listed as the owners. Worsham negotiated with Henderson, Few and Company for a new financing commitment necessitated by the changes in the terms of petitioners' proposal to the University. By letter dated August 16, 1966, Henderson, Few and Company agreed to provide the necessary financing for the development and sale of the project. This letter was drafted by Worsham to document requirements specified by Henderson, Few and Company. [6] The commitment, containing an express provision for assignment, was accepted and signed by petitioners and by Worsham, signing for GWG. *383 After considerable negotiation and the lapse of 2 or 3 weeks after the first meeting, petitioners entered into an agreement with GWG dated August 25, 1966, in which petitioners agreed to sell and Worsham and Goldberger agreed to buy: (a) All of the real estate owned by Mathis and Gerson within the project; (b) all the options which Mathis and Gerson held on any real estate within said project and the contract to purchase which they had on one parcel; (c) all of the rights and privileges of petitioners to the letter of intent from the University of Tennessee dated June 24, 1966, and the right to negotiate the contract with the University for the sale of the project; (d) all plans and specifications which they had with Mr. Good and/or his firm, and (e) any and all other contracts, documents, instruments or other matters relating to the development and construction of the Laurel Heights Apartments. In consideration of all of the foregoing, GWG agreed to pay petitioners the sum of $402,594.95, which figure was to be adjusted upward or downward for certain items such as land acquisition costs in excess of a specificied amount, interest on borrowed funds, and any savings which petitioners *384 could effect on certain plumbing subcontracts. The agreement of sale was specifically conditioned upon the University of Tennessee entering into a binding contract with GWG in accordance with the terms of its letter of intent dated June 24, 1966. Petitioners were paid $3,000 by GWG at the time they entered into the contract. The balance of the purchase price was to be paid from the first construction funds received by GWG or its assigns. Under the agreement, GWG was required to assume and pay all amounts owed to Mr. Good and his firm and any and all amounts owed for soil testing. GWG further agreed to reimburse petitioners for the amounts already paid for architects' fees, survey expense, building permits and demolition permits. GWG was also required to exercise the options. Between August 25, 1966, and October 10, 1966, an agreement was negotiated with the University of Tennessee. Petitioners were present at some of the meetings and were named as parties to the documents which eventually closed the transaction with the University. The purpose of petitioners' presence was to provide continuity and to prevent the University of Tennessee from attempting to renegotiate the *385 deal which had culminated in the letter of intent dated June 24, 1966. Although petitioners took no active part in these later negotiations, they continued to hold themselves out to the University, as they had in the past, as developers, sponsors, and contractors of the project. Good continued to be active in the negotiations. Negotiations with the University led to an agreement executed on October 10, 1966, by petitioners and GWG as sellers, and by the University as buyer. In part, the agreement provided: (a)That the Sellers would acquire from the University the parcel of land upon which the old apartment house was located and would use this parcel together with those that were owned by or under option to petitioners to construct a 320-unit apartment facility in accordance with final plans and specifications to be provided by Good and Goodstein; (b) that the Sellers would sell to the Buyer the completed project for the sum of $4,975,000.00 with certain adjustments; and (c) that the Sellers would have the right to assign or transfer their rights under the agreement to a third party. Although the agreement of October 10, 1966, recited that petitioners were Sellers, this again *386 was done for the purpose of providing continuity in the negotiations and to prevent the University or any other party from attempting to renegotiate any part of the deal. On November 22, 1966, the property acquired from Germat was conveyed by petitioners to GWG. Petitioner did not have the funds to exercise the options held by them on the land necessary for the Laurel Heights Project. GWG advanced petitioners $20,038.87 on August 30, 1966, $160,000.00 on November 21, 1966, and $3,000.00 on November 30, 1966, or a total of $183,038,87. Included in this total are payments of $6,423.05 to Helen Wilson, $4,307.61 to Knox Federal, and $9,918.61 to Eve Lowe. These payments were made to reduce the indebtedness on the properties owned by petitioners. The parcels of property covered by the options as well as the one parcel of property which was covered by the purchase contract were conveyed directly from the owners to GWG on various dates, all of which were after August 25, 1966. The total required to acquire the land owned by petitioners, the options, and the contract of sale was $183,283.87. GWG charged petitioners interest at 6 percent for the use of funds from the loan date until *387 settlement on January 12, 1967. On January 12, 1967, the contract of August 25, 1966, between petitioners as sellers and GWG as buyer was closed and the amount of $392,203.07 due thereunder from the buyer to the sellers was paid. As a result of this closing in 1967, petitioners realized a gain in the amount of $303,796.59.Fifty percent of the gain belonged to Mathis and 50 percent to Gerson. Subsequently, GWG realized $750,000 profit for the sale of their rights in the project to W. F. Holt and Sons, Inc. On February 7, 1967, Mathis R. Bush, Inc., (apparently resulting from the incorporation of Mathis' sole proprietorship) as subcontractor, contracted with W. F. Holt and Sons, Inc., as contractor, for the demolition of buildings located at the properties upon which the Laurel Heights Project was to be built. On their 1967 return petitioners reported their gain realized on the sale of the Laurel Heights Project as capital gain. In his statutory notice of deficiency respondent determined that the gain was taxable as ordinary income. ULTIMATE FINDINGS OF FACT Initially petitioners' interest in the Laurel Heights Project was held for the primary purpose of use in a rental *388 business. By January 1966, petitioners' purpose changed and they held their interest primarily for sale in the ordinary course of business. OPINION The sole issue for our determination is whether the gain petitioners realized on the sale of the Laurel Heights Project is taxable as ordinary income or as capital gain. Respondent contends that petitioners' activities in relation to the development of the Laurel Heights Project constituted carrying on a business of real estate development, that their rights and interests in the Project were held primarily for sale in the ordinary course of petitioners' trade or business and that gain realized therefrom must be characterized as ordinary income. Petitioners argue that they were involved in the business of real estate rental and were not holding the property for sale. Petitioners further argue that all the gain realized may be attributed to the parcels of property which they acquired from Germat, each of which was held for more than 6 months and that the gain therefore qualifies as long-term capital gain under section 1231 as being the gain from the sale of property used in a trade or business. In the alternative, petitioners *389 argue that the gain realized qualifies as long-term capital gain under sections 1221 and 1222 from the sale of capital assets held for more than 6 months. The burden of proof is on petitioners to overcome respondent's determination that petitioners' interest in the Laurel Heights Project was property held primarily for sale in the ordinary course of their trade or business. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Moreover, the statute providing favorable treatment for capital gain is a relief provision and is to be narrowly construed. Commissioner v. P. G. Lake, Inc.,356 U.S. 260, 265 (1958); Corn Products Refining Company v. Commissioner, 350 U.S. 46, 52 (1955). Initially, we note that excluded from the definitions of both a "capital asset" under section 1221 [7] and "property used in a trade or business" under section 1231 [8] is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, a finding that respondent was correct in his determination that petitioners held the property primarily for sale would *390 dispose of each of petitioners' alternative arguments and all of petitioners' gain on the sale of the Laurel Heights Project would be taxable as ordinary income. *391 Whether certain property is a capital asset, property used in a trade or business, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business is a factual question. Mauldin v. Commissioner, 195 F.2d 714, 716 (10th Cir. 1952); Fackler v. Commissioner, 133 F.2d 509, 511 (6th Cir. 1943); Raymond Bauschard, 31 T.C. 910, 915 (1959), affd. 279 F.2d 115, 117 (6th Cir. 1960). Prior cases addressing this issue are legion. Although no single factor is dispositive, among the factors considered probative in this determination are: (1) the purpose for which the property was acquired; (2) the frequency, continuity, and substantiality of the sales; (3) the extent of activities such as advertisement by the seller to attract purchasers; (4) the activities of the seller or those acting either with him or on his behalf with respect to the actual disposition of the land; (5) the substantiality of improvements in relation to either the fair market value of the taxpayers' property or the taxpayers' original cost; (6) the purpose and timing of improvements made; (7) the purpose for *392 which the property was held during the taxable years. Mathews v. Commissioner, 315 F.2d 101, 107 (6th Cir. 1963), Raymond Bauschard, supra, at 916; William B. Howell, 57 T.C. 546, 554 (1972); S. O. Bynum, 46 T.C. 295, 300 (1966). All these factors are helpful, but each case necessarily turns on its own facts and a balancing of all relevant factors is required. Thus, an attempt to individually distinguish or resolve a case with the numerous prior cases is unnecessary. S. O. Bynum, supra, at 299. This is particularly true in the instant case which, unlike the vast majority of cases in this area which deal with property subdivision and sales to a large number of purchasers, involves the assembly of several parcels of property and their development and sale to one customer. Despite this major distinction, gain from both the assembly and the subdivision of property may be characterized as either capital or ordinary depending on other relevant factors. Pennroad Corp. v. Commissioner, 261 F. 2d 325, 330 (3rd Cir. 1958), affg. 29 T.C. 914 (1958), cert. denied *393 359 U.S. 958 (1959). The fact that the sale here was to one "customer" does not prevent characterization of the gain as ordinary income. Robert W. Pointer, 48 T.C. 906, 917 (1967), affd. 419 F. 2d 213 (9th Cir. 1969)
Our factual analysis is guided by judicial construction of the statutory phrase "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." As this Court has noted, the statute uses the express word held; thus, while the taxpayer's purpose in acquiring the property is relevant, [9] the ultimate question is the purpose for which the property is held during the period of sales.Robert W. Pointer, supra, at 916; Raymond Bauschard, supra, at 917. In Malat v. Riddell, 383 U.S. 569, 572 (1966), the Supreme Court interpreted "primarily" in the phrase "primarily for sale" to mean "of first importance" or "principally." If a taxpayer's purpose in holding property is multiple, the sale purpose must be more than substantial, it must be the primary *394 purpose.
Finally, the property must be held in the "ordinary course of his trade or business." Merely holding property with the ultimate intention of reselling is insufficient to disqualify income from characterization as capital gain.A taxpayer's activities with respect to the property must constitute the conduct of a trade or business. William B. Howell, supra at 555. This approach is consistent with the fundamental policy underlying the favorable treatment allowed to capital gains. In Malat, the Supreme Court has noted: [10]
The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Co. v. Commissioner, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner v. Gillette Motor Co.,364 U.S. 130, 134.) [383 U.S. at 572.] Thus, our analysis must also include a determination of the major cause of the gain realized by petitioners. We must determine if the gain is attributable to business activities *395 by petitioners or to investment appreciation and market fluctuations occurring irrespective of any conduct by petitioners. Turning to the facts of the instant case, our initial inquiry focuses on the primary purpose for which petitioners held their interest in the Laurel Heights Project. We agree with petitioners' contention that the property acquired from Germat was acquired by petitioners for use in a real estate rental business. However, the purpose for which property is held can change. Moreover, the ultimate question is, as we previously noted, the primary purpose for which property is held during the period in question. To determine petitioners' purpose we have carefully examined the direction of negotiations with the University and the timing and nature of petitioners' development activities. By January 1966, petitioners knew that any dealings with the University required an outright sale, either directly to the University or to a nonprofit corporation. [11] Despite this knowledge, petitioners subsequently performed *396 substantial development activities aimed at consummating the sale to the University. For example, Gerson obtained the options on the adjoining properties after it was clear that any development for the University was conditioned upon sale of the project by petitioners. Moreover, all efforts to obtain financing were thereafter based on a proposal of sale of the project by petitioners. There were no further attempts to obtain financing for the development of the project with petitioners to act as lessors. In light of these actions, we discount petitioners' argument that they at no time desired to sell the property. Instead we find that by January 1966, petitioners' primary purpose in holding the property acquired from Germat, as well as other interests in the Laurel Heights Project acquired prior to that date, changed from for use in a rental business to primarily for sale. *397 All additional interests subsequently acquired by petitioners in the Laurel Heights Project were both acquired and held with the primary purpose of sale. Petitioners retained contingency plans to build and rent a smaller apartment project at the site, but this rental purpose in holding the property became secondary at best. [12]
*398 Our second focus of inquiry is whether petitioners' activities with respect to the Laurel Heights Project constitute the carrying on of a trade or business. In analyzing this question we have paid particular attention to the legislative intent to distinguish between investment gain on the one hand and gain arising in the ordinary course of business on the other. After carefully considering all the activities by petitioners and their agents we conclude that petitioners were carrying on a business of real estate development. The key to our determination is that the gain realized by petitioners is largely attributable to petitioners' successful efforts to combine the properties acquired from Germat with the University tract and the optioned properties and to subsequently develop the unified tract. Moreover, most of the efforts which culminated in this combination occurred after petitioners' purpose in holding the property became primarily for sale. Thus, the gain is attributable to their real estate development activities rather than to activities in the course of their rental business. Petitioners acquired the land from Germat near the end of November 1965. It was only during *399 the brief period of two months--between the end of November 1965 and the end of January 1966--that petitioners could realistically have expected to develop the property for lease rather than to sell. The real value of petitioners' activities during this brief period lay in the fact that they served as the necessary prelude to the substantial development activities which later took place. This is not, as petitioners suggest it is, the case of frustration of the petitioners' original purpose for the property in its business and subsequent disposal of the asset in a manner aimed at maximizing return. Cf. Alamo Broadcasting Co.,15 T.C. 534 (1950); Carter-Colton Cigar Co.,9 T.C. 219 (1947); Solomon Wright, Jr.,9 T.C. 173 (1947). The property was still suitable for use in petitioners' rental business. Cf. Gudgel v. Commissioner, 273 F. 2d 206 (6th Cir. 1959). Although financing for a large complex was not available if petitioners retained ownership, there is no indication that development of a smaller rental property was not feasible. Construction of the smaller 24-unit or 100-unit project could actively have *400 been pursued. Nothing prevented petitioners from attempting to fulfill their original purpose of devoting the property to their rental business other than their realization that, at least with respect to this venture, the business of real estate development offered far greater remuneration. Moreover, if in January 1966, upon finding that sale was required by the University, petitioners had actually abandoned their efforts to build an apartment building and without further development activities simply had sold the properties to maximize their return, the sale may have qualified for section 1231 capital gain treatment. Similarly, if the property had been held solely as a capital asset, which it was not, and petitioners sold it without performing substantial development activities, the gain realized may have qualified as capital gain. Instead, petitioners effectively changed their purpose in holding the property and subsequently performed substantial development activities to which the gain realized must be attributed.
We also note that the University did not solicit the development and sale of the project. Cf. Gudgel v. Commissioner, supra at 210; Robert L. Adam, 60 T.C. 996, 1000 (1973). *401 Petitioners did initiate contact with the University at a time when their primary purpose was to act as lessors, but they aggressively pursued consummation of the deal even after it was obvious that their role would be as developers and vendors. Many of the planning, design, and negotiating activities for the project were conducted by those in the firm of Good and Goodstein. However, this work was done as agents for petitioners and the activities are therefore attributable to petitioners. The law is well settled that a business may be operated through agents and that income derived therefrom nevertheless is taxable as ordinary income. Robert W. Pointer, 48 T.C. 906, 916 (1967), affd. 419 F. 2d 213, 216 (9th Cir. 1969); Walter H. Kaltreider, 28 T.C. 121, 124 (1957), affd. 255 F. 2d 833, 838 (3d Cir. 1958); Fackler v. Commissioner, 133 F. 2d 509, 511 (6th Cir. 1943). Although petitioners' interest was sold to GWG in August, the sale was conditioned on eventual sale to the University and to insure that the conditions were satisfied, petitioners continued to attend negotiations with the University and *402 to hold themselves out as developers. Many of the final development activities were performed by GWG but the petitioners' gain was tied to the success of these activities.Consequently, petitioners did all in their power to facilitate the efforts by GWG. "The [petitioners] cannot be permitted to insulate [themselves] from the acts of those persons whose efforts were so closely related to [their] own." Robert W. Pointer, supra, at 916. The fact that petitioners continued other business activities during the development of the Laurel Heights Project, though material, is not determinative. A taxpayer may be engaged in more than one business at the same time. Morris W. Zack, 25 T.C. 676, 680 (1955), affd. 245 F. 2d 235 (6th Cir. 1957), cert. denied 355 U.S. 823 (1957); Fackler v. Commissioner, supra at 511-512; S. O. Bynum, 46 T.C. 295, 300-301 (1966).And we believe the record before us clearly requires the conclusion that petitioners' activities in the development of this project were sufficient in themselves to constitute carrying on a business. Petitioners efforts were *403 not merely improvements in an attempt to dispose of their holdings advantageously in an orderly business-like manner. Cf. Gudgel, supra at 211; Yunker v. Commissioner, 256 F. 2d 130, 134-135 (6th Cir. 1958). When considered in light of all other factors, the substantiality and value of petitioners' developmental activities in relation to the original cost of the interests involved and their individual fair market values is convincing evidence. S. O. Bynum, supra at 300. The gain did not result from appreciation over a long period of time, nor may the gain be attributed to short-term market fluctuations. Rather, the gain is solely attributable to the development activities of petitioners, their agents and their associates. See Robert W. Pointer, supra at 917. Clearly, petitioners' activities with respect to the Laurel Heights Project constitute the carrying on of a business of real estate development. In summary, we have found that petitioners held their interest in the Laurel Heights Project primarily for sale to customers in the ordinary course of their trade or business. Thus their profit fails *404 to qualify as capital gain under either section 1231 or sections 1221 and 1222. We hold that gain realized by petitioners from the sale of the Laurel Heights Project is taxable as ordinary income. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise noted.↩
2. By 1965, Mathis owned 12 parcels of rental property which he described as follows: (a) A two-story brick residence located at 2019 Highland Avenue which he had converted into six rental units. (b) A duplex located at 1208 Forest Avenue. (c) A four-unit apartment building at 1645 Highland Ave. (d) A small office building at 2744 Painter Street. (e) A rental house at 2737 Jersey Street.
(f) A rental house at 2715 Jersey Street. (g) A four-unit apartment house at 1615 Highland Avenue. (h) A duplex at 2011 Highland Avenue. (i) A six-unit apartment house located at 215 Seventeenth Street. (j) A nine-unit apartment building at 2112 Highland Avenue. (k) A rental residence at 1537 Laurans Street. (l) A rental residence at 1008 Twenty-Third Street. In 1965, Mathis sold the rental house located at 1537 Laurans Street, Knoxville, Tennessee, and reported such sale as a capital transaction on his 1965 income tax return. This property was located in the eastern part of the City of Knoxville at a distance of 2 or 3 miles from the University of Tennessee and the area in which the other properties owned by Mathis were located. Mathis considered the house as substandard property located in a blighted area. During the period 1964 to 1968, Mathis owned unimproved land as well as improved land. Subsequent to the taxable years in issue here, Mathis purchased 9 acres of land in September 1968, from Marion Kelly and Paul Robertson. The entire tract was sold or traded to Rogers Cadillac. In 1969, petitioner Mathis and one Charles Maner owned 276 acres referred to as Tall Pines Estates. Petitioner Mathis reported the sale of 21 lots of the subdivision on his joint Federal income tax return for 1969. In addition to the rental properties owned by Mathis and the rental properties owned by Germat, Inc. (see text infra), Mathis had at various times interests in other rental properties as follows, occasionally in combination with Gerson: (a) Prior to 1965, Mathis and Gerson each had a 25 percent interest in the Clinch Avenue Realty Corporation which owned a three-story office building at Walnut and Clinch Avenue in Knoxville, Tennessee, and a 60-unit apartment house in Chattanooga, Tennessee. (b) At the time of the trial, Mathis had a 37-1/2 percent interest in Townside Apartments which consisted of a 30-unit apartment building on Broome Road. (c) At the time of the trial, Mathis also owned a 37-1/2 percent interest in an 80-unit apartment building on Jersey Street. (d) Prior to 1965, Gary Construction Company (the stock of which was wholly-owned by Mathis and Gerson) had a 30-unit apartment building on Yale Avenue. (e) Prior to 1965, Mathis had owned a four-unit apartment building on Rose Avenue. (f) At the time of the trial, Mathis also owned a 40-unit apartment building located at 2749 Sullins Place.↩
3. The transactions concerning the properties to this point were as follows: ↩
Date of
Acquisition
Acquisition
Sales Location
by Germat
Cost
Price
1606 Highland Ave.
July 29, 1963
$10,201.00
$15,000.00
1612 Highland Ave.
September, 1963
$ 9,834.62
$12,500.00
309 Sixteenth Ave.
October 15, 1963
$14,560.43
$27,500.00
and Vacant Lot
4. The letter contained the following passages: This building is to be built by the developers and rented to the University of Tennessee thru a not for profit corporation as a unit on a lease-purchase basis. The University of Tennessee will [sic] rent the individual apartments to the Students, handle all the management and pay all of the operating expenses. The developers will, in effect, take out their costs and profits when the University of Tennessee takes over and will then be out of the picture with the University of Tennessee handling the mortgage expenses as well as all other expenses. It is the intent of the University and the developers to have this project financed on the basis of a taxexempt bond issue on a similar basis for the financing of the present 420 unit apartment project for the University of Tennessee which is now in the process of being completed. * * * 1. Developers and Sponsors - Mathis R., and Gerson Bush, 2744 Painter Avenue, Knoxville, Tennessee. * * * 11. Interim Financing
It is desired that interim financing be disbursed from the proceeds of the bond sale. This could be handled by a trustee on behalf of the non-profit corporation which would be the contracting agency * * * 12. Construction
The developer is also a contractor and proposes to do the construction himself or in joint venture with another contractor. Contractor would be bonded to the non-profit corporation as the contracting agent. 13. Features of Arrangements for Contract with University of Tenn. * * * C. Preliminary Contract Documents
The architects are now in the process of preparing the final preliminary scheme which will be acceptable as a contract document both to the sponsors and to the University of Tennessee. * * * D. Letter of Intent to Lease
The University of Tennessee will then issue a letter of intent to enter into a lease agreement with the developers through a non-profit corporation at an agreed upon price. The letter of intent gives the developer the option of executing or rejecting the lease agreement when final project cost is determined. E. Plans and Lease Price
As consideration for receipt of the letter of intent the sponsors will proceed with an advance issue of working drawings and will price the project out to assure that it can be constructed at the price which will permit the sponsors to take up the option offered by the letter of intent and execute a lease with the University of Tenn. The final plans and specifications will then be completed and construction will begin. * * * G. Real Estate Tax
Since the lessor will be a non-profit corporation and the lessee will be the University of Tennessee, there will be no real estate tax applicable to this project. * * * ↩
5. The letter contains the following provisions: We hereby submit our proposal to finance the $5,324,000. Laurel Heights Apartment Project to be leased to the University of Tennessee. The lease between the University and the non-profit corporation shall be a net lease with the payments used to amortize debt and the University responsible for operation, maintenance, taxes, insurance, occupancy, etc. The lease shall substantially conform with the lease used on the Golf Range Project. The term of the lease shall be forty years. * * * The University will have a cash option to purchase the project two years from the date of the Letter of Intent at a price of $5,424,000. This price includes the penalty for releasing the lender from the long term commitment.↩
6. The letter contained the following statement: It is contemplated that the financing for development and construction provided herein shall be accomplished by the issuance of securities by a general welfare corporation to be chartered under the laws of the state of Tennessee which will acquire title to real property and enter into a sale agreement for the completed facility with the University of Tennessee.↩
7. SEC. 1221 CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; ↩
8. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS (a) General Rule.-If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses, from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *
(b) Definition of Property Used in the Trade or Business.-For purposes of this section- (1) General Rule.-The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not- * * $ (B) property held by the taxpayer primarily for sale to customers in the ordinary course of of his trade or business, * * *↩
9. See the list of probative factors and accompanying citations supra↩.
10. Although the "statutory provision" the Supreme Court was addressing was section 1221, their statement applies with equal force to section 1231.↩
11. At first, it was contemplated that a tax-exempt corporation would act as lessor with the University as lessee with an option to buy. Eventually, it evolved that the tax-exempt corporations would be used solely to finance the construction of the project with sale to the University upon completion.↩
12. In support of their alternative contentions, petitioners initially argue that all gain which they realized may be attributed to the property which they acquired from Germat. The significance of this argument is that were we to find that petitioners' interest in the Laurel Heights Project was not held primarily for sale in the ordinary course of their trade or business, then the holding period of the underlying assets would be determinative of whether the assets would qualify for long-term capital gain treatment. Although the holding period of some of the other assets is in issue, it is uncontested that the holding period of the property acquired from Germat was greater than 6 months We find petitioners' argument unpersuasive. As petitioners point out, neither the agreement of August 25, 1966, nor the settlement sheet of January 12, 1967, contains any allocation of the sales price among the various items included in the sale. We accept petitioners' premise that the values of the individual items not acquired from Germat were, by themselves, no more than what petitioners had paid for them. We do not accept petitioners' conclusion that all gain on the sale of their interest in the project, therefore, must be attributed to the properties acquired from Germat. The sum of the appraised value as of December 10, 1965, of the properties acquired from Germat was $55,000.00. This reflects an appreciation from the aggregate price of $36,596.05 paid for the properties by Germat in 1963. There is no indication that the properties individually appreciated further by the time of the August 17, 1966, agreement. Indeed, all the options, except one for which a contract for sale was entered, were purchased in January 1967 and renewed at the same option price within a few days of the execution of the sales agreement. Moreover, GWG had no interest in purchasing these properties unless the entire tract was put together, developed into an apartment house and sold to the University; the August 17, 1967, agreement was expressly so conditioned. Any suggestion that the four parcels of property worth $55,000.00 in December 1965 were worth $358,796.59 ($303,796.59 plus $55,000.00) in August 1966 is contrary to the evidence. Moreover, even if we were inclined to find that the gain realized by petitioners is solely attributable to the property acquired from Germat, that would not alter our ultimate finding that the gain was from property held primarily for sale, on the facts before us, and, consequently, was taxable as ordinary income. Conversely, it would be necessary for us to allocate gain to the underlying property only if we found that the property was not held primarily for sale to customers in the ordinary course of petitioners' trade or business.↩