WILLIAM A. POWE TRUST, W. A. POWE, W. A. POWE, JR., AND R. T. JACKSON, TRUSTEES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM A. POWE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Powe Trust v. Comm'r
Docket Nos. 10704-78, 10705-78. United States Tax Court
T.C. Memo 1982-488; 1982 Tax Ct. Memo LEXIS 260; 44 T.C.M. (CCH) 933; T.C.M. (RIA) 82488; August 24, 1982. *260 Held: Amount of adjusted basis in the stock of Cuban corporations whose assets were confiscated by the Castro regime determined. Held further: Respondent's determination of basis in timber sold by Trust to Crown-Zellerbach corporation in 1973 sustained. Held further: Timber sold by petitioners in 1973 did not constitute property held primarily for sale in the ordinary course of their trade or business within the meaning of section 1221(1). Robert T. Jackson, for the petitioners. Thomas R. Thomas, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioner's Federal income taxes: William A. Powe Trust, Docket No. 10704-78
Year
Deficiency
1973
$153,365.07
1974
1,187.54
William A. Powe, Docket No. 10705-78
Year
Deficiency
1972
$485.16
1973
78,904.40
1974
6,703.70
After concessions, the issues remaining for our decision are: 1. Whether petitioner William A. Powe is entitled to capital loss carryovers in 1972, 1973 and 1974 as the result of the confiscation of certain assets by the Cuban government in 1960; 2. Whether petitioner William A. Powe Trust has a basis in timber sold to Crown-Zellerbach *261 Corporation in 1973 in excess of that allowed by respondent; and 3. Whether the sale of timber by Mr. Powe and the Trust to Crown-Zellerbach Corporation in 1973 was a sale of a capital asset or a sale of property held primarily for sale to customers in the ordinary course of their trade or business. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner William A. Powe Trust (hereafter Trust) was created in 1958 under the laws of the State of Mississippi. The trustees, William A. Powe, William A. Powe, Jr., and Robert T. Jackson, were residents of Hattiesburg, Mississippi, at the time the petition was filed in Docket No. 10704-78. The Trust filed Federal fiduciary income tax returns and amended Federal fiduciary income tax returns for the years 1973 and 1974 with the Internal Revenue Service Center in Chamblee, Georgia. Petitioner William A. Powe was a resident of Hattiesburg, Mississippi, at the time the petition was filed in Docket No. 10705-78. Mr. Powe filed his Federal income tax returns for 1972, 1973 and 1974 with the Internal Revenue Service Center *262 in Chamblee, Georgia. Cuban Expropriation Losses
Mr. Powe was born in HattiesburgMississippi, in 1898 and has been a citizen of the United States at all times. He graduated from what is now Mississippi State University with a degree in chemistry in 1920 and subsequently completed postgraduate work at Louisiana State University. In December of 1920 [1] *263 Mr. Powe went to Cuba where he was employed as a bench chemist for the Guantanamo Sugar Company. After approximately 3 years and eventual promotion to chief chemist, Mr. Powe left the employ of Guantanamo Sugar Company and took the position of assistant superintendent of the Central Paraguay plant of the Punta Allegre Company, a rival sugar cane processing firm in Cuba. In 1926, the Punta Allegre Sugar Company sent Mr. Powe to Spain to take courses in colloidal chemistry at the University of Madrid in order to improve their processing system. In the late 1920's the Oliver United Filter Corporation of San Francisco perfected a continuous vacuum filter that was used to recover additional sugar values from waste products generated during the processing of sugar cane. The company recruited Mr. Powe to sell this sugar filtration equipment to factories all over the world at a beginning salary of approximately $1,000 per month. However, during the depression in the early 1930's, the company experienced financial difficulties that necessitated a reduction in the number of its employees. Rather than accepting termination of his employment Mr. Powe wrote to the president of the company suggesting that he be allowed to receive a 20 percent commission on the filtration equipment he sold in lieu of a fixed salary. This proposal was accepted by the company and Mr. Powe received commissions pursuant to this agreement until approximately 1966. Mr. Powe's sales of this new technology flourished and during the 1930's he earned over $100,000 *264 a year. Mr. Powe purchased two manganese mines in the Oriente Province of Cuba for $75,000 in the 1930's and organized the Powe-Murado Mining Company. The corporation sold over $6,000,000 worth of ore to concerns in the United States before World War II. The corporation was liquidated when the mines ceased to yield ore. During the 1940's and 1950's Mr. Powe used his accumulated capital to organize and make substantial investments in Cuban corporations. Dr. Enrique Jova, Mr. Powe's personal attorney in Cuba from 1934 to 1960, was responsible for organizing many of the taxpayer's corporations and was familiar with his client's other corporate investments. Cuban law in effect during those years required par value to be paid into the capital account of a newly formed corporation before stock could be issued. Mr. Powe held most of his stock in these Cuban corporations through a holding company, Compania Inversionista de la Florida, S.A., because of anti-American sentiment in Cuba. In 1959, Fidel Castro overthrew the government of the Cuban dictator, Batista. In August 6, 1960, the new regime proclaimed the nationalization by forced expropriation of all properties and enterprises *265 owned by citizens of the United States. Accordingly, all of Mr. Powe's Cuban business assets were confiscated. [2] Mr. Powe was attending a convention in the United States at the time of the revolution and has been unable to return to Cuba. Most of his business records remain in Cuba and are unavailable. In response to respondent's interrogatories and in testimony at trial, Mr. Powe and Dr. Jova [3] provided the following information concerning Mr. Powe's purchases of stock and contributions to the capital of Cuban corporations: Number
Percentage
Basis
Company
of Shares
of Ownership
Estimates
Willys Distributors, Inc.
4,963
58%
$ 496,000.00
to 646,000.00
Piezas y Accesorios, K-W, S.A.
1,281
58%
128,100.00
Sociedad Inmobiliaria Raritan
1,023
78%
102,300.00
Powe Machinery Co., Inc.
2,432
97%
1,000,000.00
Powe Equipment Co., Inc.
1,394
96%
to 1,500,000.00
Pioneer Trading, Inc.
985
98.5%
98,500.00
Cuban American Metals Distributors, Inc.
188
10%
18,000.00
to 18,800.00
Contratos Mobiliarios Cremo, S.A.
Unknown
100%
2,000.00
Sociedad de Inversiones La Loma
7,500
100%
750,000.00
Compania Inmobiliaria El Maney, S.A.
3,050
100%
300,000.00
Compania Petrolera Arabia, S.A.
10
2%
$ 500.00
Alta Mar
50,000.00
to 100,000.00
Total
$2,945,400.00
to 3,646,200.00
*266 Mr. Powe filed a claim (CU-0502) with the Foreign Claims Settlement Commission of the United States in October of 1965 detailing the extent of his losses relating to these corporations. [4] On February 12, 1970, the Commission certified that the value of Mr. Powe's corporate assets at the time of their confiscation was $9,507,786. Mr. Powe has never received any compensation for his losses. On his 1972, 1973 and 1974 Federal income tax returns, petitioner claimed capital loss carryovers attributable to the 1960 confiscation of his Cuban assets in excess of his capital gains for those years. [5] *267 *268 In the notice of deficiency for those years dated June 16, 1978, respondent disallowed the entire amount of the capital loss carryovers at issue for lack of substantiation. OPINION Capital Loss Carryovers
The first issue for our decision is whether petitioner William A. Powe is entitled to capital loss carryovers in 1972, 1973, and 1974 resulting from the expropriation of his corporate assets by the Cuban government in 1960. The resolution of this issue turns on the amount of Mr. Powe's adjusted basis in the stock of these corporations at the time of their confiscation. Section 165(a) [6] states the general rule that losses sustained during the taxable year and not compensated for by insurance or otherwise are allowed as a deduction. In the case of individuals, however, deductibility is limited to (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and (3) casualty and theft losses. [7] *269 Section 165(c). Section 165(g) provides that in the case of a worthless security, [8] the loss resulting therefrom shall be treated as a loss from the sale or exchange of a capital asset. The amount of the capital loss deduction allowed under section 165(g) is the taxpayer's adjusted basis in the security as defined in section 1011. [9] *270 An individual is allowed a carryover of unused capital losses for an unlimited number of years. Section 1212(b). [10] Mr. Powe provided extensive testimony detailing his lengthy career as an investor and businessman in Cuba. Equipped with an educational background in chemistry and experience in the Cuban sugar industry he was able to make large sums of money selling sugar filtration equipment. Mr. Powe used *271 these commissions to purchase manganese mines and in turn used the proceeds from the sale of the ore to capitalize new corporations and purchase stock in various other corporations. Thus providing a source for the large amounts of capital that he claims he invested in various corporations, Mr. Powe described the investments he made in Cuba over the course of several decades. Although plagued by a dearth of financial records resulting from their confiscation by Cuban authorities, Mr. Powe was able to testify in detail regarding his business investments. His testimony concerning the amount of his investments and the extent of his holdings was corroborated by Dr. Enrique Jova, who served as Mr. Powe's attorney in Cuba from 1934 until 1960. Dr. Jova was personally responsible for the chartering of many of Mr. Powe's corporations and was familiar with the remainder of his corporate investments. In 1964, Congress authorized the Foreign Claims Settlement Commission of the United States to determine the validity of claims by nationals of the United States against the government of Cuba arising out of the expropriation of their property. [11] In October of 1965, Mr. Powe filed claim number *272 CU-0502 with the Commission detailing the fair market value of his property at the time it was confiscated. On February 12, 1970, the Commission certified the amount of his loss to be $9,507,786. Despite all the testimony adduced at trial respondent contends that the evidence is insufficient to prove that Mr. Powe had either any initial cost basis or adjusted basis in the stock of the confiscated corporations. It is true, as respondent points out, that petitioner bears that burden of proving the amount of his adjusted basis in the stock at the time the corporate assets were expropriated by the Castro regime. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Additionally, we note that he is not relieved of the burden even though the relevant corporate records are unavailable. See Interlochen Co. v. Commissioner,232 F.2d 873, 878-879 (4th Cir. 1956), affg. 24 T.C. 1000 (1955). However, we do not believe that as a consequence of Mr. Powe's inability to prove the precise amount of his adjusted basis that he is necessarily condemned to a finding that none existed. As aptly stated by the court in Commissioner v. Maresi,156 F.2d 929, 931 (2nd Cir. 1946), *273 "the one sure way to do injustice * * * is to allow nothing whatever upon the excuse that we cannot tell how much to allow." We found Mr. Powe's detailed testimony as to his business career in Cuba and the extent of his investments and the corroborative testimony of Dr. Jova to be forthright and entirely credible. Both were candid as to their inability to be exact in their testimony due to both the passage of several decades and the lack of corporate records. We find it significant that a claim was filed by Mr. Powe with the Foreign Claims Settlement Commission in 1965 detailing the fair market value of his loss. Although we recognize that the fair market value of stock immediately before it becomes worthless is not determinative of a taxpayer's adjusted basis in that stock, we agree with petitioner that it is relevant to demonstrate the reasonableness of the basis asserted by the petitioner. [12]
In Cohan v. Commissioner,39 F.2d 540, 543-544 (2nd Cir. 1930) the Second Circuit held that this Court's predecessor, the Board of Tax Appeals, erred *274 in not allowing as a deduction some portion of claimed entertainment expenses. The court stated: The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. * * * It is not fatal that the result will inevitably be speculative; many important decisions must be such. Because of the impossibility of proving the exact amount of Mr. Powe's adjusted basis, we believe this is an appropriate case for the Court to approximate as best we can the amount of petitioner's deductible loss. See Abraham v. Commissioner,9 T.C. 222, 226 (1947); Solt v. Commissioner,19 T.C. 183, 188 (1952); Reisner v. Commissioner,34 T.C. 1122, 1129 (1960). We are satisfied that petitioner did sustain a loss upon the expropriation of the assets of *275 his Cuban corporations and that he had, in fact, some amount of adjusted basis in the stock of those corporations as of the date of confiscation. After examining all the evidence, and considering that the initial personal investments made by Mr. Powe could have been recouped by various means prior to expropriation by the Castro regime, we find and hold the petitioner's adjusted basis in the stock of his corporations at the time of their confiscation was $1,500,000. FINDINGS OF FACT Timber
At the recommendation of friends in Hattiesburg, Mr. Powe began purchasing tracts of timberland in Mississippi for investment purposes in the late 1930's. As Mr. Powe resided in Havana, Mr. E. Wheeler Bryant, a friend experienced in the timber business in Mississippi, acted as his agent for purchasing and managing timber property. Mr. Bryant [13] was given a power of attorney to make timberland purchases and was paid either a 10-percent commission or given a 10-percent interest in such land purchased for Mr. Powe. Mr. Powe was able to obtain tracts of timberland during this period of time for as little as $6 per acre. At the time of trial some of these tracts were worth in excess of $1,500 per acre. *276 Occasionally, some tracts that had been farms were purchased and trees were planted on the acreage. Mr. Powe did not sell any timber or any of these tracts of land before his return from Cuba in 1959. Mr. Powe considers himself a retired businessman but remains active in his personal investments. [14] He maintains an office in his home for the purpose of overseeing his dealings in stocks, bonds, timberland and other investments. The value of his brokerage accounts is approximately one-half million dollars. Mr. Powe pays his living expenses primarily with dividends generated from these accounts. Mr. Powe has been a member and director of the Mississippi Forestry Association for approximately 15 years and was previously a member of the American Tree Farm Association. He is also a member of the Board of Directors of a bank in Hattiesburg and is the editor of the "Sugar Journal," a technical magazine for sugar technologists. Mr. Powe and the Trust do not maintain any printed business cards, invoices *277 or stationery which has any connection with their dealings in timberland. Other than Mr. Bryant (who made purchases of land while Mr. Powe resided in Cuba), neither Mr. Powe nor the Trust has ever employed a timber buyer. In addition Mr. Powe and the Trust do not own any sawmills or lumber yards. The William A. Powe Trust was created on April 22, 1958. Mr. Powe, as trustor, named his wife and children as its beneficiaries. The Deposit Guaranty Bank of Jackson, Mississippi, was the original trustee. After the resignation of the Bank as trustee in 1962, the present trustees, William A. Powe, William A. Powe, Jr., and Robert T. Jackson were substituted. The following tracts of timberland totaling 13,065.2 acres were transferred by Mr. Powe to the trust upon its creation: Mineral
Year
Interest
Cost
Total
Tract
Acquired
Acres
Acquired
Per Acre
Cost
Clayton and Walter Mitchell
1945
2,460  All
$ 6.00
$14,700
J.O. Barron
1948
1,205  1/2
20.00
24,100
Lee Estate
Unknown
169  All
Unknown
Unknown
Stevens
1953
800  1/2
16.00
12,800
Gavin
1954
3,280  1/4
10.00
32,800
Sartin
1955
1,668.2
1/2
35.00
58,387
Black & Hathorn
1956
1,116  None
25.00
27,900
G.H. Williams
1957
2,007  1/4
50.00
100,350
Fornea
1957
360  1/2
65.00
23,400
Additional property *278 transferred to the Trust in 1958 included mineral rights, royalty interests, livestock, farm equipment and a large parcel of real property known as the Pinehill Ranch. The Trust subsequently acquired additional timberland. In 1960, the Trust purchased equipment, including tractors, trucks and loaders, for use in cutting timber. The timber sales by the Trust between 1958 and 1972 are as follows: Gross
Year
Sale Price
1958
$ 75.84
1959
5,790.98
1960
79,401.03
1961
25,584.38
1962
5,044.01
1963
1964
355.29
1965
221.22
1966
1967
1968
76,229.59
(erroneously reported on Mr. Powe's individual return)
1969
16,738.86
1970
17,682.77
1971
6,830.61
1972
18,840.00
$252,794.58 In 1964 the Trust claimed business expenses on its return for seedling and forestry supplies totaling $631.05. In 1966 the Trust claimed business expense deductions for payments for pine seed, seedlings, caretaker and tree planting expenses of $4,178.18. In 1969, the Trust claimed business expenses for clearing timber debris from hurricane damage of $1,432.75 and $19,757 for tree planting and contract labor. The timber sales by Mr. Powe between 1960 and 1972 are as follows: Gross
Year
Sale Price
1960
1961
1962
1963
1,998.92
1964
4,171.50
1965
4,445.09
1966
781.92
1967
14,270.30
1968
141.00
1969
[15] *279 1970
1971
4,592.00
1972
117.91
$30,518.64
In 1973, Mr. Powe reported the following timber sales: [16]
Crown-Zellerbach
$ 57,002.00
Georgia Pacific
93,555.75
Delta Pine
12,610.00
$163,167.75 In 1964, Mr. Powe reported total farm expenses of $3,837.30, including $202.50 for pine seedlings, $216.09 for supplies, $250 for treated pine seed and $1,129.75 for contract planting of pine seedlings. In 1964, he also sold for $400 a used pulpwood truck which he had acquired in 1960. In 1965, Mr. Powe claimed farm expenses totaling $6,035.08 for supplies, weed tree poisoning, seeds and plants and contract planting. In 1966 Mr. Powe claimed a deduction of $730 for the contract planting of seed and seedlings. In 1967, Mr. Powe claimed a deduction of $16,401.44 for pine seedlings, contract planting, forestry and caretaker services. In 1968, a deduction of $7,269 was claimed *280 for similar items and services. On January 1, 1973, Mr. Powe and the Trust entered into a Timber Sale Agreement and Surface Use Agreement with the Crown-Zellerbach Corporation. Under the terms of the agreement Mr. Powe and the Trust conveyed all existing timber, trees, and other forest products located on 8,960.54 acres of land in Mississippi to Crown-Zellerbach for $320,000 paid as follows: Trust
$262,998.00
Powe
57,002.00
$320,000.00
The agreement also provided for a surface use agreement for an initial term of 60 years and for successive renewal periods of 15 years each.
The property of Mr. Powe subject to the Crown-Zellerbach agreement consisted of 1,078.59 acres located in Convington and Perry counties. The property of the Trust subject to the agreement consisted of 7,881.95 acres, as follows: Acres (to
Cost Basis
Tract Name
County
nearest acre)
Per Acre
Barron
Lamar
611
$20.00
Stevens
Perry
774
16.00
Fornea
Pearl River
263
65.00
Williams
Pearl River
1,850
50.00
Gavin
Perry
2,450
10.00
Knight
Perry
30
40.00
Blackwell
Perry
70
100.00
Holliman
Perry
40
No timber
Ridgeway
Forrest
904
140.00
Shoemake
Perry
101
100.00
Mathis
Jackson
120
258.33
Dearman
Perry
60
70.00
Ward
Perry
150
100.00
Masonite
Perry
120
16.00
Kervin
Covington
340
131.00
The Barron *281 tract was acquired by Mr. Powe in 1948 for $20 per acre. In 1958, he transferred 1,205 acres of the Barron tract to the Trust. All merchantable timber was cut off this tract in 1960 and 1961. In 1967, Mr. Powe reported the sale of approximately 335 acres of the Barron tract for $23,438. He claimed a basis in this tract of approximately $35 per acre. The Stevens tract was acquired by Mr. Powe in 1953 for $16 per acre. Some timber had been cut from this tract shortly before its acquisition. In 1958, the Stevens tract had natural nonmerchantable young growth of timber on it. In 1960 and 1961, some timber was cut off this tract. The Stevens tract also contained some swamp-land on which no timber stood. The Fornea tract was acquired by Mr. Powe in 1957 for $65 per acre. Mr. Bryant attributed 20 percent of the purchase price of the tract to minerals. The Fornea tract had natural nonmerchantable young growth on it in 1958. Timber was cut on this tract prior to the Crown-Zellerbach sale. The Fornea tract adjoins the Williams tract. The Williams tract was acquired by Mr. Powe in 1957 for $50 per acre. Mr. Bryant attributed $10 per acre of the purchase price to minerals. [17] In 1958, *282 the Williams tract had natural nonmerchantable young growth on it. Some timber was cut off this tract prior to the Crown-Zellerbach sale. The Gavin tract was acquired by Mr. Powe in 1954 for $10 per acre. He transferred 3,280 acres of this tract to the Trust in 1958. There was very little merchantable timber on this tract when purchased and was not enough timber in 1960 and 1961 to make cutting profitable. The Trust sold two hundred acres in 1963 for $50 per acre. The Trust made other land sales off this tract over the years. The Knight tract consists of 30 acres in Perry County and was purchased by the Trust on September 13, 1963, for $40 per acre. The Blackwell tract is located in Perry County and originally consisted of 80 acres. It was purchased by the Trust on September 23, 1965, for $100 per acre. Ten acres of this tract were excluded from the Crown-Zellerbach sale. The Holliman tract is located in Perry County. It consists of 40 acres acres and was purchased by the Trust on October 20, 1966. There *283 has never been any merchantable timber on this tract. The Ridgeway tract consists of 904 acres and was purchased by the Trust in 1967 for $140 per acre. Substantially all of the timber on this tract was cut in 1968. [18] Mr. Powe mistakenly reported this timber sale on his own 1968 Federal income tax return. In 1971, the Trust sold 10 acres of the Ridgeway tract for $5,000 claiming a basis of $150 per acre. The Shoemake tract consists of approximately 101 acres and is located in Perry County and was purchased by the Trust on January 17, 1967, for $100 per acre. The Mathis tract consists of 120 acres and is located in Jackson county and was purchased by the Trust on May 26, 1967, for a total cost of $31,000. Timber was cut on this tract prior to the Crown-Zellerbach sale. [19]
The Dearman tract is located in Perry County and was purchased by the Trust in 1968. It consists of 60 acres and was purchased for $70 per acre. The Ward tract is located in Perry County, consists of 150 acres and was purchased by the Trust in 1970 *284 for $100 per acre. The Masonite tract, located in Perry County, consists of 120 acres and was acquired by the Trust in 1970 in exchange for approximately 80 acres of the Stevens tract also located in Perry County. The Kervin tract, located in Covingon County, consists of approximately 340 acres and was purchased by the Trust in 1970 [20] for $131 per acre. There have been no detailed records maintained regarding which tracts of timberland were cut and no records were kept regarding basis in timber sold since the acquisition of the various parcels. On its 1973 Federal income tax return, the Trust reported a capital loss from the sale of timber to Crown-Zellerbach Corporation in the amount of $213,654, computed as follows: Gross Sales Price
$262,998.00 Basis
476,652.00 Loss
($213,654.00)
In the notice of deficiency, respondent determined that the Trust realized ordinary income rather than a capital loss on this sale of timber. Respondent further determined that the Trust's basis in timber sold to Crown-Zellerbach Corporation was $51,395.92 rather than *285 the reported amount of $476,652. Petitioner-Trust has conceded that the reported amount of basis is incorrect and now maintains on brief that the correct basis is $257,921.80. The property of Mr. Powe subject to the January 1, 1973, agreement with Crown-Zellerbach Corporation consisted of several parcels totaling 1,078.59 acres. County
Acres
Covington
40.00
Perry
1,038.59
On Mr. Powe's 1973 Federal income tax return, he reported a capital gain from the sale of timber of $54,897, computed as follows: Gross Sales Price
$57,002.00
Basis
[21] 2,105.00
Capital Gain
$54,897.00
In the notice of deficiency respondent determined that Mr. Powe's reported gain from the timber sale was ordinary income rather than capital gain. OPINION Trust's Basis in Timber Sold to Crown-Zellerbach in 1973
On its 1973 Federal income tax return the Trust reported a basis of $476,652 in timber sold to Crown-Zellerbach for $262,998 in that year. Respondent determined that the correct amount of basis remaining in the timber located on the 7,881.95 acres subject to the sale was only $51,395.92, and, accordingly, disallowed the claimed capital loss. At trial, petitioner-Trust *286 conceded that the amount of basis stated on its 1973 return was in error and now maintains that its correct basis in the timber is $257,921.80. Petitioner bears the burden of proving that respondent's basis determination is in error. Rule 142(a). The 7,881.95 acres subject to the 1973 timber sale consist of 15 distinct parcels which were acquired over the course of three decades. These parcels were either purchased by Mr. Powe and subsequently transferred to the Trust or were acquired directly by the Trust. The Trust made no determination of basis allocation among the land, mineral rights and timber upon acquisition of the parcels and kept no detailed records of the amount of timber cut on the various tracts during the intervening years. The record reflects that timber has been cut on many, if not all, of the parcels and that certain of the tracts were depleted of their first growth prior to 1973. The Trust's reported timber sales since its creation in 1958 total approximately $250,000. [22]
Timber is an asset subject to an allowance for *287 depletion. [23] Section 611(a). The capital recoverable through depletion allowances in any year is the taxpayer's adjusted basis in the timber. Section 612; section 1.611-3(a), Income Tax Regs. A taxpayer's basis for the cost depletion of timber is his cost basis adjusted as provided by section 1016. Section 1016(a)(2) provides that cost basis shall be reduced for depletion to the extent of the amount allowed as a deduction in computing taxable income but not less than the amount allowable. The depletion of timber takes place at the time it is cut. Section 1.611-3(b)(1), Income Tax Regs. Therefore, even though the Trust did not claim depletion allowances at the time of the various cuttings, the basis remaining in the timber must be determined by decreasing the cost basis [24] of the timber by the amount of depletion allowable under section 611. A taxpayer is not permitted to take advantage in a later year of his prior failure to claim a depletion allowance. Section 1.1016-3(a)(1)(ii), Income Tax Regs.In order to sustain its burden of proving its adjusted basis consistent with these rules, the Trust must first establish what portion of the cost of each parcel of timberland was properly *288 allocable to timber existing [25] at the time of acquisition and then reduce that figure by the amount of timber cut from the tract prior to the 1973 sale. On brief, petitioner-Trust maintains that the correct adjusted basis figure available *289 to it as of January 1, 1973, is $257,921.80. This figure is computed by taking the total cost basis of the tracts ($421,675) [26] and allocating approximately 78 percent of that figure to timber ($328,754.80) and allocating the remaining 22 percent to the land itself ($92,920.20). The purported initial timber basis is then decreased by $70,833 which was the amount of basis claimed on the sale of timber from the Ridgeway tract in 1968. [27]
Petitioner-Trust states that this computation is based on the testimony of Robert Hatcher, its timber appraisal expert. The Trust introduced into evidence a document prepared by Mr. Hatcher in 1975 which provides a similar allocation of the initial cost basis of each parcel to timber and land. While we sympathize *290 with the near impossibility of the creation of accurate basis records at this late date we are unable to accord Mr. Hatcher's testimony and appraisal more than minimal weight. The parcels were purchased between the years 1948 and 1972 and the determinative time for allocation of a portion of the cost basis to existing timber was at the respective dates of their acquisition. Although R. Hatcher had some information as to cuttings on the various parcels we believe that the accuracy of an estimation made in 1973 as to the quantity of timber existing on each parcel at the time it was acquired would be purely coincidental. In addition, no basis was allocated to mineral interests acquired with the land. Finally, as we have discussed, even if we were to accept petitioner's cost basis figure, that amount would have to be reduced by the allowable depletion (i.e., the total timber sales from those parcels) even though no depletion allowance was claimed. Section 1016(a)(2). We note that the maintenance of proper records as required by respondent's regulations would have obviated this controversy. Section 1.611-3(e)-(h), Income Tax Regs. Thus, we must conclude that petitioner-Trust has *291 not met its burden of proof, and accordingly, we sustain respondent's determination on this issue. Sale of Timber by Mr. Powe and the Trust
The final issue for our decision is whether the sale of timber by Mr. Powe and the Trust to Crown-Zellerbach Corporation in 1973 was the sale of a capital asset thus entitling petitioners to capital gain treatment on the taxable proceeds. [28] Section 1221 provides in relevant part as follows: *292 SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.
Respondent determined that for both Mr. Powe and the Trust the sale of the existing timber constituted a sale of property held "primarily for sale to customers in the ordinary course of [petitioners'] trade or business" within the meaning of section 1221(1), thus subjecting the taxable proceeds to ordinary income treatment. [29] The term "primarily" as used in section 1221(1) has been interpreted to mean "of first importance" or "principally" and not merely a substantial purpose. Malat v. Riddell,383 U.S. 569, 572 (1966). Additionally, section 1221(1) has been held to encompass those sales which are part of the everyday operation of a business but not the realization of an increase in value which *293 has accrued over a substantial period of time. Malat v. Riddell,supra;Bynum v. Commissioner,46 T.C. 295, 302 (1966) (concurring opinion by Judge Tannenwald). Once again the burden of proof is on the taxpayers to prove that the subject timber was held by each of them as a capital asset and not as determined by respondent. Welch v. Helvering,supra; Rule 142(a). In addition, we note that because the capital gains provisions are an exception to the normal tax rates they are to be construed narrowly. Corn Products Refining Co. v. Commissioner,350 U.S. 46, 53 (1955). *294 [30]
The question of whether property is held as a capital asset or primarily for sale to customers in the ordinary course of a trade or business ultimately turns on the unique combination of facts in each case. Crosby v. United States,414 F.2d 822, 826 (5th Cir. 1969); Bauschard v. Commissioner,279 F.2d 115, 117 (6th Cir. 1960), affg. 31 T.C. 910 (1959); McManus v. Commissioner,65 T.C. 197 (1975), affd. 583 F.2d 443 (9th Cir. 1978). The impossibility of formulating and applying a clearly defined test which would produce predictable results was noted by the Court of Appeals for the Fifth Circuit in Biedenharn Realty Co. v. United States,526 F.2d 409, 415 (5th Cir. 1976): No one set of criteria is applicable to all economic *295 structures. Moreover, within a collection of tests, individual factors have varying weights and magnitudes, depending on the facts of the case. The relationship among the factors and their mutual interaction is altered as each criteria increases or diminishes in strength, sometimes changing the controversy's outcome. As such, there can be no mathematical formula capable of finding the X of capital gains or ordinary income in this complicated field. Factors most often considered in determining whether property is held as a capital asset include the (1) nature and purpose of the acquisition of the property and how long it was subsequently held; (2) a characterization of the taxpayer's attempts to sell the property; (3) the number, extent, continuity and substantiality of sales; (4) the amount of development and advertising of the property for sale; (5) the use of a business sales office; (6) the type and extent of control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer customarily devoted to the sales. United States v. Winthrop,417 F.2d 905, 910 (5th Cir. 1969); McManus v. Commissioner,supra at 211. There is little *296 dispute about the underlying facts in this case. Petitioners and respondent differ only as to the implications and conclusions drawn therefrom. Although we have found as a fact that the tracts of timberland were originally acquired by petitioners as investments, we note that such purpose "has no built-in perpetuity nor a guarantee of capital gains forevermore." Biedenharn Realty Co. v. United States,supra at 421. While the purpose for which the timberland was acquired has evidentiary weight the "end question is the purpose of the 'holding' at the time of the sale or sales." Bynum v. Commissioner,supra at 299. However, ordinary income treatment is not mandated "merely because, as is usually true, [a taxpayer's] principal intent at the exact moment of disposition is sales. Rather [capital gains treatment will be denied] in those instances where over time there has been such a thoroughgoing change of purpose * * * as to make untenable a claim either of twin intent or continued primacy of investment purpose." Biedenharn Realty Co. v. United States,supra at 423 (footnote reference omitted). Petitioners contend that the timber sold to Crown-Zellerbach in 1973 continued to be held an *297 an investment or, in the alternative, was not held primarily for sale to customers. After consideration of the entire record we agree with petitioners that the subject timber retained its status as a capital asset. Timber Sale by Petitioner-Powe
Mr. Powe began purchasing tracts of Mississippi timberland as an investment in the late 1930's during his lengthy sojourn in Cuba. He transferred some of these tracts to the Trust upon its creation in 1958. No timber sales were made by Mr. Powe until after his return from Cuba in 1959. The total gross proceeds from timber sales realized prior to 1973 was $30,518.64 or an average of $2,348 yearly for those 13 years. [31] *298 Mr. Powe testified that some of these sales were made to retire a debt on a particular tract and others were made as a matter of good forestry management. For example, on certain tracts large trees were harvested in order to allow sunlight *299 to reach younger growth. In August of 1969, Hurricane Camille passed over certain tracts. The removal of this storm-damaged timber was necessary to prevent insect infestation. Although respondent argues that such activities strongly suggest the running of a timber "business," we agree with petitioner that under these facts it is more logical to view them as reasonable actions undertaken to protect and increase the value of his investment. [32] Expenses were also incurred during the years 1964-1968 for the planting of seedlings, poisoning of weed trees, and other miscellaneous items. While the purchase of such items and services could under certain circumstances be indicative of a timber business we do not think that level was reached here. In addition to his timberland Mr. Powe also owned stocks and bonds having a value of approximately one-half *300 million dollars. Dividends generated from these accounts were used to pay his living expenses. Mr. Powe was 74 years old at the time of the Crown-Zellerbach sale. On the facts presented we are unable to conclude that Mr. Powe was in the business of selling timber. Rather, we think Mr. Powe is what he claims to be, that is, a retired businessman who takes reasonable steps to protect and improve his investments. Accordingly, we hold that his sale of timber to Crown-Zellerbach in 1973 constituted the sale of a capital asset and accordingly he is entitled to capital gains treatment on the taxable proceeds. Timber Sale by Petitioner-Trust
The Trust was created in 1958 and over 13,000 acres of timber-land were transferred to it by Mr. Powe at that time. Other property transferred to it in 1958 included mineral rights, royalty interests, livestock, farm equipment and a large ranch. Prior to the Crown-Zellerbach sale the Trust had sold a total of approximately $250,000 worth of timber. Mr. Powe testified that some of these sales were made to retire debts on the land and to purchase additional property. He testified that sales were particularly necessitated after the expropriation of *301 his property in Cuba. We note that timber sales occurring during the years 1959-1961 totaled $110,776.39. Sales of timber were also made when trees were thinned and timber damaged by storms was removed. We note that Hurricane Camille passed through Mississippi in August of 1969. Timber sales in 1969 and 1970 totaled $34,421.63.
It is true, as respondent points out, that the Trust claimed business expenses from 1964-1968 on its fiduciary return for such things as seedlings, contract planting, and the clearing of timber debris from hurricane damage and that such expenses are indicative of a timber business. However, as with petitioner Powe, we do not believe that the activities of the Trust rose to the level of a timber business. In the January 1, 1973, sale to Crown-Zellerbach, the Trust sold the standing timber on 8,960.54 acres of land for $262,998 and also gave the buyer a surface use agreement for an initial term of 60 years. This 1973 sale was over three times larger than any sale of timber previously made by the Trust and was, we believe, "the realization of appreciation in value accrued over a substantial period of time," Commissioner v. Gillette Motor Transport, Inc.,364 U.S. 130, 134 (1960), *302 and not the "profits and losses arising from the everyday operation of a business." Corn Products Refining Co. v. Commissioner,supra. Also, because we have found that the Trust was not in the timber business the sale was not an attempt to convert stock in trade into a capital asset. Respondent places particular reliance on Biedenharn Realty Co. v. United States,supra. That case involved the question of the ordinary income treatment of profits arising from the sale of subdivided real estate. There the court held that where the taxpayer had sold a substantial number of lots, had vigorously improved the subdivisions and had engaged in extensive sales efforts, the sale of properties in the relevant tax years generated ordinary income and not capital gains. We see little similarity between the facts of that case and the instant one and thus we find it of limited help in resolving the issue before us. After considering all the factors involved and the record as a whole, we conclude the petitioner-Trust's sale of timber to Crown-Zellerbach was not made in the ordinary course of its trade or business. Accordingly, we hold that the timber was not held by the Trust primarily for sale to *303 customers in the ordinary course of its trade or business within the meaning of section 1221(1). Thus, the Trust's gain from this sale constitutes capital gain. Decisions will be entered under Rule 155.
Footnotes
1. The stipulation of facts filed herein by the parties states that Mr. Powe went to Cuba in 1929. However, the uncontradicted testimony at trial indicates that Mr. Powe first began living in Cuba and engaging in business there at least by late 1920. Although the effect of the difference is minor here, where stipulated facts are clearly contrary to facts disclosed by the record we have discretion not to be bound by the stipulation. Jasionowski v. Commissioner,66 T.C. 312, 318↩ (1976).
2. After the confiscation of the Cuban corporations the holding company distributed the stock of the individual corporations back to Mr. Powe. Mr. Powe owned 100 percent of the holding company.↩
3. Dr. Jova personally organized all of Mr. Powe's corporations with the exception of Pioneer Trading, Compania Petrolera Arabia, S.A. and Alta Mar.↩
4. Because of a lack of sufficient data to substantiate the amount of his investment in Alta Mar, no reference was made to this corporation (which owned investment lots in a subdivision) in Mr. Powe's formal claim with the Commission. At trial Mr. Powe also testified that he owned individually two additional lots in this subdivision and that he paid approximately $20,000 to $24,000 for them.↩
5. A reference to Mr. Powe's Cuban losses first appears on his Federal income tax return for 1966. On that return he refers to the carryover as "an Operating Loss Carryover of $9,920,604.54 represented by my losses in Cuba in 1960 as substantiated by my claim No. CU-502 filed in October 1965 with United States Foreign Claims Commission." This figure $9,920,604.54, was the amount Mr. Powe claimed as the book value of all his assets in Cuba at the time of their expropriation. On February 12, 1970, the Commission certified the amount of Mr. Powe's loss as $9,507,786. Thereafter, Mr. Powe used this figure in computing the amount of his remaining carryover each year. According to petitioner's calculations, the amount of this carryover available in 1972 was $9,410,018. Petitioner now concedes that the total amount of his adjusted basis in the stock of the confiscated corporations (estimated by Mr. Powe and Dr. Jova to be between $2,945,400 and $3,646,200) is the proper figure to be used in computing his capital loss carryover rather than the figure certified by the Commission.We are confident that petitioner and respondent can come to an agreement as to the correct amount of remaining capital loss carryover in the Rule 155 computation consistent with this opinion.
6. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure. ↩
7. The law is clear that confiscation of property by a foreign government does not entitle a taxpayer to a theft or casualty loss deduction under section 165(c)(3). Farcasanu v. Commissioner,50 T.C. 881 (1968), affd. 436 F.2d 146 (D.C. Cir. 1970); Powers v. Commissioner,36 T.C. 1191↩ (1961). However, in 1964, Congress enacted section 165(i) to allow certain expropriations by the Cuban government to be deemed casualties or thefts and thus deductible for tax purposes. The losses at issue here do not meet the requirements of previous section 165(i) for casualty loss treatment.
8. The term "security" is defined in section 165(g)(2)(A) as "a share of stock in a corporation." ↩
9. Section 1011 provides in pertinent part: (a) General Rule.--The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 * * *) adjusted as provided in section 1016. 10. Although the law in effect at the time Mr. Powe's stock became worthless in 1960 allowed only a 5-year carryover of capital losses, the 1964 Revenue Act (Pub. L. 88-272, 78 Stat. 99) amended section 1212 to provide for an unlimited carryover of capital losses of individuals. A transitional rule provided that if an individual taxpayer would have been eligible under the old law to carryover a capital loss to a taxable year beginning after 1963, the loss will be treated as a short-term capital loss sustained in that year and eligible for further carryover until exhausted. (Section 1212(b)(2).) Accordingly, since Mr. Powe was eligible under the old law to carryover his capital losses to 1964, he is entitled to unlimited carryover of his losses.↩
11. 22 U.S.C. section 1643 et seq.↩
12. Indeed, if a claim had not been filed with the Commission, it is likely that we would find petitioner's claim here far less believable.↩
13. Mr. Bryant died in approximately 1967. Mr. Powe was born in 1898 and was 81 years old at the time of trial.
[14]↩ Mr. Powe was born in 1898 and was 81 years old at the time of trial.
15. Mr. Powe's 1969 Federal Income Tax Return was not introduced into evidence.
16. The status of the other timber sales in 1973 as capital transactions (i.e., to Georgia Pacific and Delta Pine) apparently was not challenged by the respondent. Also on his 1973 return Mr. Powe reported ordinary income of $6,139.05 relating to a payment by Crown-Zellerbach for the annual growth of timber.↩
17. Originally the Williams tract consisted of 2,007 acres in Pearl River County, Mississippi; only 1,850 acres of the Williams tract was subject to the Crown-Zellerbach sale.↩
18. The Trust sold 1,770,819 board feet of timber from the Ridgeway tract for $76,229.56.↩
19. The Mathis tract was the poorest tract of timber in the Crown-Zellerbach sale.↩
20. The parties stipulated that the Trust purchased the Kervin tract in 1974. The correct year, according to the purchase contract, is 1970.↩
21. Mr. Powe's basis in this timber is not in dispute.↩
22. We note, however, that an undeterminable portion of these timber sales were from tracts of land not involved in the sale to Crown-Zellerbach.↩
23. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule.--In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary * * *. ↩
24. Although amounts paid in connection with the planting of timber would ordinarily be added to the cost basis, the Trust treated these expenses as deductions from income in the year incurred. Section 1.611-3(a), Income Tax Regs.↩ Therefore, the Trust is not entitled to any upward adjustments to its cost basis for these items. 25. The Trust is not entitled to any basis in timber which is the result of natural growth since the acquisition of the land. See Skinner Brothers Realty Co. v. Commissioner,17 B.T.A. 364↩ (1929).
26. According to petitioner's computation the total cost of all the parcels was $421,675. This figure is overstated by $21,456 because of the use of a incorrect price per acre for the Stevens and Masonite tracts. This total does not include the cost of the Holliman tract as it was stipulated that no timber existed on that parcel at the time of its acquisition. ↩
27. This sale was erroneously reported on Mr. Powe's individual return for that year.↩
28. The agreement executed on January 1, 1973, between the petitioners and Crown-Zellerbach Corporation provides both for the sale of the existing timber on the subject lands and a Surface Use Agreement for an initial term of 60 years. The agreement provides a purchase price for the existing timber of $320,000 ($262,998 to the Trust and $57,002 to Mr. Powe). The agreement also provides for an annual payment to petitioners for the use of the subject lands. Only the income tax treatment of the initial payment in 1973 for the purchase of the existing timber is in issue here. Respondent does not argue that the $320,000 payment exceeds the fair market value of the timber existing at the time of the execution of the contract. (See Rev. Rul. 62-81, 1962-1 C.B. 153↩.)
29. Section 631(b) provides that a taxpayer who disposes of timber by contract but retains an economic interest in such timber is entitled to capital gains treatment on the proceeds regardless of whether the timber was held for sale to customers in the ordinary course of his trade or business. Section 1.631-2(a)(2), Income Tax Regs.↩ Petitioners have conceded that section 631(b) is not applicable here because they did not retain the required economic interest in the timber sold to Crown-Zellerbach. Therefore, petitioners are only entitled to capital gains treatment if the subject timber was a capital asset within the meaning of section 1221.
30. In Commissioner v. Gillette Motor Transport, Inc.,364 U.S. 130, 134 (1960) the Supreme Court noted that: This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year.↩
31. Respondent points out that on Mr. Powe's 1970 Federal income tax return the following statement appears: This taxpayer is a tree farmer and owns many acres of timberland. He is very active in his work and looks after his business daily. No trees were cut or sold in 1970 but income will be recognized in future years. Also, on Mr. Powe's 1971 return the following statement appears: I am a Tree Farmer and own many acres of Timberland. I am very active in this work and look after this business daily. Stumpage reported on this return was rather small, but will amount to considerable income in future years. These statements were included to explain a claimed deduction for home office expenses. Office expenses incurred in connection with investment activities were deductible under section 212 prior to taxable years beginning after December 31, 1975 and the enactment of section 280A. Mr. Powe testified that this office was also used to keep up with his dealings in stocks, bonds, and other investments. Thus, we find these statements deserving of little weight in resolving the issue of whether the timber sold in 1973 was a capital asset. Respondent also notes that Mr. Powe listed his occupation on certain of his income tax returns as "tree farmer." We note that on the returns for other years his occupation, where listed, was variously stated as "Retired," "Investments," and "Editor." We find petitioner's stated occupation irrelevant to the issue before the Court.
32. It is unclear whether respondent objects to the process of thinning and the removal of storm-damaged trees themselves or the sale of the timber resulting from these practices. Certainly since we view these practices as being reasonable investment protection under the facts herein, a sale of such items seems an appropriate disposition.↩